**J. W. NEFF and Elizabeth A. Neff**

v.

**The UNITED STATES.**

No. 419–59.

United States Court of Claims.
April 4, 1962.

Durfee, J., and Darr, Senior District Judge, sitting by designation, dissented in part.

Norman A. Peil, Jr., Easton, Pa., for plaintiffs.

Earl L. Huntington, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. James P. Garland and Philip R. Miller, Washington, D. C., on the brief.

LARAMORE, Judge.

This is an action for refund of income taxes in the amount of $8,702 plus interest thereon, paid by plaintiffs as a result of deficiencies assessed. The sole legal issue before us is whether a transaction effecting a redemption of stock by a closely held corporation, as set out below, constituted a distribution essentially equivalent to a dividend, and was thus taxable to plaintiffs as ordinary income within the purview of section 302 of the Internal Revenue Code of 1954, 26 U.S.C. (I.R.C.1954) § 302 (1958 ed.), or whether it was a distribution in full payment in exchange for the stock and not so taxable.

J. W. Neff Laboratories, Inc. (hereinafter referred to as the company) was organized and incorporated in Delaware during May 1938. Under the charter 500 shares of $10 par value common stock were authorized, of which 100 shares were issued. Plaintiffs owned 48 of these shares (47 Mr. Neff; and 1 Mrs. Neff).[1] Thereafter during 1938 the company was incorporated in Pennsylvania, with authorized capital, stockholders, and distribution of shares remaining identical. The Delaware franchise was subsequently terminated.

No further transactions occurred with respect to company stock until September 1949, when Mr. Neff purchased the 51 shares held by the other major original stockholder from his estate for $14,000. Mr. Neff paid $6,000 of the $14,000 purchase price from his personal funds, and the remaining $8,000 from funds which he borrowed from the company in return for his personal note. After this purchase Mr. Neff owned 99 of the company's 100 outstanding shares.

During September 1950 Mr. Neff borrowed an additional $5,000 from the company for which he again gave his personal note. This brought his total indebtedness on notes payable to the company to $13,000.

Between 1946 and 1954 the company produced material from which phonograph records were fabricated. During these years the company operated under an arrangement with the Binney & Smith Company whereby Binney & Smith financed certain of the company's operations. By 1954 competition in the phonograph record business had become acute, and profits had diminished. Additional capital was required by the company to embark on a different manufacturing operation.

The testimony indicates that it was ultimately concluded that the most feasible method for raising needed capital was through the local sale of company stock. It was decided that Mr. Neff would sell 47 of his shares to the company. The presence of the 400 authorized but unissued corporate shares was apparent from the readily available basic corporate documents as well as through a simple computation apparent on the face of each stock certificate. Had the company issued new shares to meet its need for additional capital, the result would have been substantially similar. Despite the apparent availability of this alternative course, on September 30, 1954, Mr. Neff transferred 47 shares to the company for $405 per share, or a total of $19,035. At this time book value of the shares was $852.47 per share. The total price of $19,035 was paid by the company by: (a) cancellation of the $13,000 in notes payable from Neff to the company; (b) cancellation of a loan receivable representing cash advances to Mr. Neff from the company amounting to $776.55; (c) transfer to Mr. Neff of an automobile owned by the company and valued at $2,434.11; and (d) creation of an open account in Mr. Neff's favor on the company books of $2,824.34.

The Government, viewing the transaction as a distribution essentially equivalent to a dividend, and thus subject to tax as ordinary income, assessed a deficiency which plaintiffs have paid. Plaintiffs, in their suit for refund, contend the deficiency assessment was erroneous because the redemption resulted in a corporate distribution which was payment in exchange for stock held more than six months and thus taxable only under the provisions of the code relating to long-term capital gains.

Plaintiffs' position that the assessment was erroneous is bottomed on two contentions; that the redemption was undertaken exclusively for a valid corporate purpose, to raise corporate capital, and that after the redemption and subsequent

---

1. Inasmuch as § 318 of the Code attributes these shares to Mr. Neff for all purposes relevant to this proceeding, and since all of the action taken with respect to shares for the purposes of this litigation was taken by Mr. Neff, we shall refer to Mr. Neff as holding all of the shares for the remainder of the opinion.

to the sale of 38 of the 47 redeemed shares taxpayers' proportionate holding of outstanding company shares had changed radically.

The Government, in countering plaintiff's contention that the redemption is not essentially equivalent to a dividend, relies on the structure and history of section 302, 26 U.S.C. (I.R.C.1954) § 302 (1958 ed.). Section 302(a) provides that if a corporation redeems its stock within the meaning of section 317(b), to which the present redemption conforms, and if any one of subparagraphs (1), (2), (3), or (4) of subsection 302(b) applies to the transaction, the redemption will be treated as a distribution in part or full payment in exchange for stock. Subparagraph 302(b) (1) requires that the redemption be treated as a distribution in payment in exchange for stock if it is "not essentially equivalent to a dividend."

█ We are of the opinion that the transaction in this case was not equivalent to a dividend. The reason we think this is not equivalent to a dividend is that plaintiff was the sole stockholder of the J. W. Neff Laboratories, Inc. This corporation needed additional operating capital. It could not borrow money from the banks; no purchaser would buy stock directly from Mr. Neff since the proceeds of the sale would inure to Neff rather than to the corporation. Hence Mr. Neff decided to sell to the company 47 of the 99 shares he owned, at about half of the book value of the shares. This was for the purpose of permitting the corporation to resell these, which it thought it could do at a profit, and thereby secure the capital necessary to the continuation of the corporation. The corporation did resell 38 shares [2] over a period of between 9 to 12 months, and realized a profit greatly in excess of what the corporation had paid Mr. Neff. The fact that the resale was

accomplished over a period of some 9 to 12 months, in our opinion, would not change the complexion of the transaction. Obviously the stock could not be immediately sold at the profit eventually realized. The 9- to 12-month period necessary to complete the transaction should not, and could not, as later demonstrated, alter the situation to the extent of making the sale equivalent to a dividend.

█ Thus, when the transaction is viewed as a whole, the entire purpose had been accomplished; i. e., the gathering of additional money to sustain the future operations of the corporation. We realize that the presence of a valid business purpose alone is not controlling. Holsey v. Commissioner, 3 Cir., 258 F.2d 865, 869; Northup v. United States, 2 Cir., 240 F.2d 304, 307. However, in this situation Mr. Neff, after the sale, had a quite different interest than before. This being true, the money and property given him by the corporation in exchange for his stock could not be considered the equivalent of a dividend. When a person receives a dividend, his interest in the company remains exactly the same. This is not the case here. After the entire transaction, Mr. Neff's interest in the company was 56 percent as opposed to his 99 percent stock ownership before.

It is true that section 302(b) (2) (C) (i) contains the language "immediately after the redemption." However, the fact that the stock was sold by the corporation over a period of months would not, in our opinion, have the effect of bringing into play section 302(b) (2) of the 1954 Code. Section 302(b) (1) of the 1954 Code was a re-enactment of section 115(g) of the 1939 Code, 26 U.S. C.A. § 115(g) and reiterated the essential equivalent to a dividend test. The prior law on the subject was preserved,

2. The amount received for the nine shares redeemed by the corporation but unsold was essentially equivalent to a dividend, since plaintiff's interest in the corporation was not reduced. Consequently, plaintiff's claim for capital gains treatment as to these nine shares of stock is without merit.

as is disclosed by the legislative history of section 301(b) (1).

Senate Report No. 1622, 83rd Congress, 2nd session, in discussing subsection (b) of section 302, U.S.Code Cong. & Adm.News 1954, p. 4870, states:

" * * * In lieu of the approach in the House bill, your committee intends to revert in part to existing law by making the determination of whether a redemption is taxable as a sale at capital gains rates or as a dividend at ordinary income rates dependent, except where it is specifically provided otherwise, upon a factual inquiry.

\* \* \* \* \* \*

"Subsection (b) of Section 302 states three conditions in paragraphs (1), (2), (3), and (4), *the satisfaction of any one of which* will result in the treatment of the redemption as a distribution in full or part payment in exchange for the stock. [Italic supplied]

\* \* \* \* \* \*

"Paragraph (1) of subsection (b) provides that subsection (a) will apply if the redemption is not essentially equivalent to a dividend.

"The test intended to be incorporated in the interpretation of paragraph (1) is in general that currently employed under section 115 (g) (1) of the 1939 Code. Your committee further intends that in applying this test for the future that the inquiry will be devoted solely to the question of whether or not the transaction by its nature may properly be characterized as a sale of stock by the redeeming shareholder to the corporation. * * *."

From the above language, it seems clear that the tests under the 1939 Code are still pertinent to cases arising under section 302(b) (1) of the 1954 Code and that the remaining subsections (2), (3), and (4) of said section serve not as restrictions on the scope of subsection (1), but as additional areas in which capital gains treatment will be permitted. This was likewise held in the case of Radnitz v. United States, D.C., 187 F.Supp. 952, 956.

Having met the test of section 302(b) (1), i. e., that the redemption was not equivalent to a dividend, the intent of Congress as shown by Senate Report No. 1622, supra, was that the amount realized on the stock redemption should receive capital gains treatment.

For the above reasons, plaintiffs are entitled to recover and judgment will be entered to that effect.

The amount of recovery will be determined pursuant to Rule 38(c) of the Rules of this court, 28 U.S.C.A.

It is so ordered.

JONES, Chief Judge, and WHITAKER, Judge, concur.

DURFEE, Judge (concurring in part and dissenting in part).

I agree with the majority decision as to the corporate distribution for the nine redeemed shares that were never resold by the corporation being essentially equivalent to a dividend. I disagree with the majority in that I believe the corporate distribution for the remaining thirty-eight redeemed shares was also essentially equivalent to a dividend.

As I view the transaction presently before the court the redemption bears no relation whatever to the subsequent change in Neff's proportionate interest in the company. The majority seems to place great emphasis on the assumption that the redemption served a valid business purpose—the acquisition of additional capital. I believe first, that the redemption was unrelated to this purpose, and second, that business purpose is irrelevant inasmuch as under § 302(b) (1) the net effect of the transaction must be deemed controlling. The net effect of this redemption was the pro rata distribution of $19,035 of the corporation's accumulated earnings and profits.

Once having decided upon the desirability of acquiring additional capital, the

most obvious course for the corporation would have been to issue additional corporate shares and have the company sell them. Had thirty-eight additional shares been issued and sold in precisely the same manner as undertaken here, the assets of the company would have remained intact prior to the sale, the total assets would have been enlarged by an identical amount of new capital from the sale, and Neff's proportionate ownership in the corporation would have been altered to a degree substantially equivalent to the change that resulted from the transaction as it actually occurred. Instead the more complex and circuitous redemption procedure was chosen which brought an identical amount of new capital to the company and changed Neff's proportionate interest in the company to essentially the same degree. The only difference between the newly-issued-stock route and the chosen redemption route was that the latter resulted in a $19,035 pro rata distribution out of the company's accumulated earnings and profits to Neff, who at the time held 99 of 100 corporate shares. In this context the distribution of $19,035 is entirely divested of real relation to the ultimate change in proportionate ownership, and bears every attribute of a dividend.

It appears to me that in reaching a contrary result the majority has overlooked entirely the realities of the closely held—or in this case, single-owner corporation. Presumably had the corporation retired the shares acquired from Neff and then issued new shares for subsequent sale, the majority would have concluded that the distribution was equivalent to a dividend inasmuch as there would have been no formal connection between redemption and ultimate change in proportionate ownership. I find no greater connection between redemption and ultimate change in proportionate interest in the facts as they actually transpired. It is difficult for me to perceive how, in the context of a company in effect owned, controlled, and directed by one individual, the mere change in wording of the fiat decreed by that single owner should change the tax consequences of the transaction. Moreover, it would seem that the majority decision raises a red flag for alert tax counsel to be on notice that on any occasion that a closely held corporation wishes to acquire additional capital by sale of corporate shares, it may simultaneously return a dividend distribution for its shareholders that will be subject only to capital gains tax treatment, merely by first effecting a pro rata redemption of some of their shares. I do not believe this to be the import of the applicable statutory provisions.

For the reasons stated I must respectfully dissent from the decision of the court.

DARR, Senior District Judge, sitting by designation (concurring in the dissent).

As I see the case the only applicable statutory provisions are:

Section 302 of the Internal Revenue Code of 1954, 26 U.S.C. § 302.—

"(a) General rule.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraphs (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

"(b) Redemptions treated as exchanges.—

"(1) Redemptions not equivalent to dividends.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend. * * *

"(5) Application of paragraphs.—In determining whether a redemption meets the requirements of paragraph (1), the fact that such redemption fails to meet the requirements of paragraphs (2), (3), or

(4) shall not be taken into account. * * * *"

The case will not turn upon the ratio between the number of shares of stock owned by Mr. Neff before the redemption and the number owned thereafter, and also there is out of consideration the language "immediately after the redemption."

The sole question, as I see it, is a factual inquiry as to whether by redemption of the shares of stock Mr. Neff's ownership in the corporation remained the same or was enhanced. This question will turn on whether his remaining shares of stock after the completion of the redemption plan were worth as much or more than the 99 shares of stock were worth before the redemption.

As stated in the majority opinion, immediately before the redemption the corporation needed additional operating capital; could not borrow money from the banks; and no purchaser would buy stock from Mr. Neff. Obviously the stock had no market value before the redemption. The amount paid to Mr. Neff for the stock would not fix the market value. Therefore, the only criterion for the value of the stock is the book value, which was said to be $852.47 per share. However, this includes the $19,035.00 received by Mr. Neff as an asset. Assuming that this amount was a dividend, the book value of each share of the corporation's stock was $662.12. This latter is the proper figure to use in the calculations.

Five months after the redemption, the corporation sold 20 shares of this stock for $2874.00 per share. Between March 21, 1955 and January 11, 1956, 18 more shares were sold as follow:

9 shares  ........ $3569.00 per share
3 shares  ........ 3925.00 per share

4 shares .........  4000.00 per share
2 shares .........  4250.00 per share

This makes a total of $125,876 new money coming into the corporation's treasury.

It will not be fair to say that the sale by the corporation set up a market value for the stock, the method would properly be the book value. Before the redemption, the corporation was worth $66,-212.00 as reflected by the book value of $662.12 per share. It received $125,-876.00 new money from the sale of the stock by the corporation, making the total assets of the corporation $192,088.00 and the book value of the 91 outstanding shares $2103.58 per share.

Before the redemption Mr. Neff's 99 shares, at book value, were worth $65,-549.88 and after the completion of the redemption plan his 52 shares, at book value, were worth $109,386.16. The result is that Mr. Neff's remaining 52 shares of stock after the redemption plan was completed were worth $43,836.-28 more than his 99 shares of stock before the redemption.[1] It might also be noted that after the redemption plan, Mr. Neff still remained in control of the corporation.

After the redemption plan was completed Mr. Neff's remaining stock was worth substantially more and he was, in addition, $19,035.00 to the good.

Under these facts it seems plain to me that the enrichment of Mr. Neff by the redemption transactions would definitely place the $19,035.00 he received as being essentially equivalent to a dividend.

---

1. The calculations do not include the 9 shares of stock in the treasury of the corporation as an asset. If included as an asset in the calculations, Mr. Neff's enrichment was more.