JOSEPH C. GALLAGHER AND SOPHIE GALLAGHER, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 87610–87612, 87667. Filed October 17, 1962.

*Henry D. Costigan, Esq., Gordon M. Weber, Esq.,* and *John B. Lowry, Esq.,* for the petitioners.

*Donald G. Daiker, Esq.,* for the respondent.

[1] Proceedings of the following petitioners are consolidated herewith: William J. Bush and Margaret A. Bush, Docket No. 87611; George H. Grant and Margaret F. Grant, Docket No. 87612; Thomas E. Cuffe, Deceased, The Bank of California, National Association, Executor, and Claire E. Cuffe, Docket No. 87667.

150

OPINION.

OPPER, *Judge:* Respondent's position consists of two alternative contentions which are so mutually exclusive as to make it desirable to consider them separately. His first argument, as stated in his brief, is "predicated basically on the thesis that the facts show that a complete [or partial] liquidation did not in substance occur." He therefore insists that the amount received by the individuals consisted of a dividend [2] within the purview of section 301 of the 1954 Code. Although he does not specifically refer to section 302, the implication appears to be [3] that the redemption, which he does not dispute, was essentially equivalent to a dividend [4] under section 302(b)(1), see *Neff v. United States*, 305 F. 2d 455 (Ct. Cl. 1962), vacating and withdrawing 301 F. 2d 330 (Ct. Cl. 1962), and hence is not to be treated as a capital transaction [5] under section 302(a), but as a dividend [6] under section 301(c)(1), with ordinary income consequences. [7] His alternative argument is that this was a reorganization [8] within the meaning [9] of section 368, that presumably the proceeds of the redemp-

---

[2] His brief states: "The entire amount received by petitioners upon 'liquidation' of the Delaware corporation constituted a dividend within the purview of Section 301."

[3] According to his brief, "The liquidation distributions are in reality dividends to petitioners and taxable as ordinary income." And, "If the transfers [presumably upon redemption] have the effect of a dividend taxable as a distribution under Sec. 301, the entire amounts received are taxed as ordinary income."

[4] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.
(b) REDEMPTIONS TREATED AS EXCHANGES.—
(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

[5] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.
(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

[6] SEC. 301. DISTRIBUTIONS OF PROPERTY.
(c) AMOUNT TAXABLE.—In the case of a distribution to which subsection (a) applies—
(1) AMOUNT CONSTITUTING DIVIDEND.—That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

[7] SEC. 316. DIVIDEND DEFINED.
(a) GENERAL RULE.—For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—
(1) out of its earnings and profits accumulated after February 28, 1913, or
(2) out of its earnings and profits of the taxable year * * *

[8] As he says in his brief: "It is true that the respondent in the instant case does take the position that the Delaware corporation in substance was never liquidated, but was merely reorganized as a California corporation."

[9] SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.
(a) REORGANIZATION.—
(1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

tions constituted "boot," and, accordingly, under section 356, are, at least to some extent, to be treated as ordinary income.[10]

There can be no doubt that the stock of Delaware was redeemed [11] and, if that were all there was to it, we might look to section 302, and then to section 301, for guidance in settling the ordinary-income problem. But the redemption was only one step in what was undoubtedly a liquidation-reincorporation operation, see *David T. Grubbs*, 39 T.C. 42 (1962), as respondent himself suggests in his second alternative.

As to the first proposition, we are accordingly able to resort to the step-transaction theory and to view the entire series of transactions as interrelated and inextricable.

It is well settled that where a transaction is comprised of a series of interdependent steps, that is to say, where the legal relationships created by any one step would have been fruitless without the completion of the entire series, the various steps are to be integrated into one for the purpose of arriving at the tax consequences of the transaction. * * * Where the facts warrant the integration of a series of steps into one, it is the situation at the beginning and at the end of the series which determines whether there has been a statutory reorganization, or merely a taxable exchange.

*Southwell Combing Co.*, 30 T.C. 487, 497–498 (1958). Respondent does not, in fact, suggest anything to the contrary, but merely con-

---

*   *   *   *   *   *   *

(C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of substantially all of the properties of another corporation, but in determining whether the exchange is solely for stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded;

(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;

(E) a recapitalization; or

(F) a mere change in identity, form, or place of organization, however effected.

[10] SEC. 356. RECEIPT OF ADDITIONAL CONSIDERATION.

(a) GAIN ON EXCHANGES.—

*   *   *   *   *   *   *

(2) TREATMENT AS DIVIDEND.—If an exchange is described in paragraph (1) but has the effect of the distribution of a dividend, then there shall be treated as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be treated as gain from the exchange of property.

[11] SEC. 317. OTHER DEFINITIONS.

(b) REDEMPTION OF STOCK.—For purposes of this part, stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property, whether or not the stock so acquired is cancelled, retired, or held as treasury stock.

tends that some of the steps actually taken can be disregarded.[12] But, at least in such a situation as this, we cannot justify the inclusion of some and the exclusion of other essential steps.

It is contended by petitioners that the cash distribution was in partial liquidation of the Bessemer Co. and was a part of the plan of liquidation of that company, but that it was not a part of the plan of reorganization. We agree with the first part of petitioners' contention, but do not agree that the cash distribution was not a part of the plan of reorganization.

*R. C. Love*, 39 B.T.A. 172, 178 (1939), affd. 113 F. 2d 236 (C.A. 3, 1940).

The concept of a continuation of the existing business through a section 331 liquidation,[13] coupled with an intercorporate transfer, falls into the general area of corporate reorganizations, so that it is in the so-called reorganization sections, if anywhere, that we should expect it to be dealt with.

The fact that the assets of a business are transferred to a new corporation does not by itself change the effect of the liquidation of the original corporation. If, for example, the assets had been transferred to another corporation in which the old shareholders had no interest, even though the business continued, *Fowler Hosiery Co.*, 36 T.C. 201 (1961), affd. 301 F. 2d 394 (C.A. 7, 1962); or if they had been transferred to another corporation, but the old corporation's business had not been continued,[14] it seems clear respondent would have had no possible ground for contending that the liquidating distribution, even though partly composed of accumulated earnings, could be taxed as an ordinary dividend. *Hellmich* v. *Hellman*, 276 U.S. 233 (1928). So that it is only the continuance of the business in a new corporation, preponderantly owned by the shareholders of the old, upon which respondent can rely for his first contention.

But, generally speaking, it is exactly where the same enterprise is in essence wholly or partly continued even after some more or less radical change in its organization or conduct that it is the purpose of the so-called "reorganization" section of the law to operate.[15] The

---

[12] "Furthermore, the 27⅓ [%] stock interest purchased in the new corporation by third parties should be disregarded and reorganization treatment applied to the step transaction. This step can be disregarded since without it the dominant purpose—to withdraw corporate earnings while continuing the equity interest in substantial part—was fully achieved."

[13] See footnote 28, *infra*.

[14] SEC. 331. GAIN OR LOSS TO SHAREHOLDERS IN CORPORATE LIQUIDATIONS.
    (b) NONAPPLICATION OF SECTION 301.—Section 301 (relating to effects on shareholder of distributions of property) shall not apply to any distribution of property in partial or complete liquidation.

[15] Income Tax Regs.
Sec. 1.368–1 Purpose and scope of exception of reorganization exchanges.
    (b) *Purpose.* * * * The purpose of the reorganization provisions of the Code is to except from the general rule certain specifically described exchanges incident to such readjustments of corporate structures made in one of the particular ways specified in the Code, as are required by business exigencies and which effect only a readjustment of continuing interest in property under modified corporate forms. * * *

basic approach of the complicated series of enactments incorporated in the 1954 Code appears to be that all such situations are to be tested by the "reorganization" portion of the statute, and that it was intended that if a transaction of a similar kind does not fall within them, but lies in the general area of arrangements which may, in effect, constitute the continuation of an existing business, it shall be treated as a transaction giving rise to gain or loss and not as a distribution.[16]

Respondent's first contention includes the insistence that we should ignore the liquidation of Delaware and test these transactions solely as a redemption.[17] Yet he makes no reference in his brief to section 302 which is the primary redemption section. It is not clear whether for this proposition he relies on the rationale of such cases as *Bazley* v. *Commissioner*, 331 U.S. 737 (1947), rehearing denied and prior opinion amended 332 U.S. 752 (1947) ; see also *Gregory* v. *Helvering*, 293 U.S. 465 (1935), although there it was a "recapitalization," not a liquidation, that was held not to fall within the statute. In *Bazley*, the Supreme Court found that a transaction which literally complied with the reorganization provisions was not to be accorded reorganization treatment because it was primarily a vehicle for the distribution of undistributed earnings. *Gregory* similarly denied the benefits of the reorganization provisions to a plan which met the literal definition of the Code because the plan had no relation to the business of either corporation.

Respondent would have us hold here that the liquidation of Delaware was not a liquidation, although it literally complied with all the

---

[16] S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., pp. 43, 230 (1954) :

"Your committee has also structurally revised the first three parts of the subchapter. Under your committee's bill, part I of the subchapter contains rules primarily devoted to the treatment of current distributions by a corporation, *and does not contain rules with respect to distributions pursuant to a recapitalization or other type of reorganization.* Part II, as under the House bill, contains rules relating primarily to liquidations. Part III relates only to reorganizations and *includes their effects on the shareholders.*

\* \* \* \* \* \* \*

"Part I of subchapter C provides rules relating to the tax treatment to shareholders of corporate distributions of property. While your committee continues the treatment provided in the House bill under which part I has *no application at the corporate level to* distributions of property in complete or partial liquidation, your committee's bill, unlike the House bill, does not include in part I rules for distributions made in connection with corporate reorganizations. Under your committee's bill, distributions and exchanges made in connection with reorganization transactions are treated, in general, in part III." [Emphasis added.]

[17] We emphasize that the partially performed contracts of Delaware which were transferred to California with its other remaining assets are not treated by respondent as in any respect giving rise to ordinary income to Delaware. *Jud Plumbing & Heating, Inc.,* 5 T.C. 127 (1945), affd. 153 F. 2d 681 (C.A. 5, 1946) ; *Commissioner* v. *First State Bank,* 168 F. 2d 1004 (C.A. 5, 1948), reversing 8. T.C. 831 (1947), certiorari denied 335 U.S. 867 ; *H. B. Snively,* 19 T.C. 850 (1953), affd. 219 F. 2d 266 (C.A. 5, 1955). The contracts were valued by the parties as being worth nothing. Respondent does not attack their action in this respect. We accordingly express no opinion upon this aspect of the entire transaction.

terms, because the transaction is alleged to have been primarily a vehicle for the distribution of undistributed earnings. But, unlike the reorganization sections which were involved in *Bazley* and similar cases, liquidation is usually accompanied by some kind of distribution which may well include accumulated earnings of the liquidating corporation. *Hellmich* v. *Hellman, supra*. That this is recognized by the statutory provisions themselves seems to us to permit of no uncertainty.[18] Even though respondent from time to time refers to the section relating to complete liquidation,[19] no definition of this term appears in the statute nor in the regulations. A complete liquidation of a corporation can apparently exist only where the definition of partial liquidation does not apply, since otherwise there would be no purpose in distinguishing between complete and partial liquidation as defined in section 346(a)(1); although, of course, there may be situations in which, since the result would be the same, it is unnecessary to determine whether the liquidation is complete or partial.

Instead, it appears that what actually occurred here must be treated as a partial liquidation since it falls squarely within the definition of such a transaction which does appear in the statute.[20] It is difficult to find any ground for holding that this was not in every respect a partial liquidation to which section 331(a)(2) would expressly apply.[21]

Section 331(a)(2) of the 1954 Code provides that amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. This carries as a natural corollary that such amounts shall not be treated as dividends.

*Fowler Hosiery Co., supra* at 222.

We think it follows that the distributions made by Delaware are governed by the rules established by section 346. There was unques-

---

[18] See footnote 14, *supra*.

[19] SEC. 331. GAIN OR LOSS TO SHAREHOLDERS IN CORPORATE LIQUIDATIONS.
  (a) GENERAL RULE.—
    (1) COMPLETE LIQUIDATIONS.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock.

[20] SEC. 346. PARTIAL LIQUIDATION DEFINED.
  (a) IN GENERAL.—For purposes of this subchapter, a distribution shall be treated as in partial liquidation of a corporation if—
    (1) the distribution is one of a series of distributions in redemption of all of the stock of the corporation pursuant to a plan; or
    (2) the distribution is not essentially equivalent to a dividend, is in redemption of a part of the stock of the corporation pursuant to a plan, and occurs within the taxable year in which the plan is adopted or within the succeeding taxable year, including (but not limited to) a distribution which meets the requirements of subsection (b).
For purposes of section 562(b) (relating to the dividends paid deduction) and section 6043 (relating to information returns), a partial liquidation includes a redemption of stock to which section 302 applies.

[21] SEC. 331. GAIN OR LOSS TO SHAREHOLDERS IN CORPORATE LIQUIDATIONS.
  (a) GENERAL RULE.—
  *        *        *        *        *        *        *
    (2) PARTIAL LIQUIDATIONS.—Amounts distributed in partial liquidation of a corporation (as defined in section 346) shall be treated as in part or full payment in exchange for the stock.

tionably a series of distributions in complete redemption of all of Delaware's stock pursuant to a plan. Although these distributions completely liquidated Delaware, the transaction literally falls within section 346(a)(1).

The conclusion that the redemption of Delaware's stock in the course of its liquidation is not to be considered as an ordinary dividend is fortified by an examination of the provisions of section 346. From the language of section 346(a), it would appear that a distribution in redemption of all of the stock of the corporation pursuant to a plan can never be essentially equivalent to a dividend as referred to in section 302(b)(1). This is because Congress found it necessary to include that condition[22] in section 346(a)(2), which refers to the redemption of a part of the stock of the corporation, but omitted it in section 346(a)(1). We cannot assume that this was without significance.[23]

Furthermore, "Section 302 does not apply to that portion of any distribution which qualifies as a distribution in partial liquidation under section 346." Sec. 1.302–1(a), Income Tax Regs. Not only this, but we have been referred to no authority, either under the 1954 Code or under the less restrictive language of the preceding revenue acts, in which a liquidation-reincorporation has been held to give rise to ordinary income, except where that result could be accomplished by applying the provisions relating to reorganizations. Cf. *Richard H. Survaunt*, 5 T.C. 665 (1945), affirmed on this issue 162 F. 2d 753 (C.A. 8, 1947); *Estate of John B. Lewis*, 6 T.C. 455 (1946), affd. 176 F. 2d 646 (C.A. 1, 1949).

Of course, this does not eliminate respondent's second argument contending for the existence of a reorganization and accompanying "boot." With the limited exception of special situations specifically provided for by statute, see, e.g., sections 333, 341, this would be the only time a series of redemptions of all the stock of a corporation pursuant to a plan, or distributions in complete liquidation of a corporation, would receive treatment as a distribution to which section 301 applies. When the redemption, whether in complete or partial liquidation, is in pursuance of a plan of reorganization, as defined by sec-

---

[22] See footnote 20, *supra*.

[23] Compare section 346(a)(1) (footnote 20, *supra*) with section 115(g)(1) of the 1939 Code:

SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(g) REDEMPTION OF STOCK.—

(1) IN GENERAL.—If a corporation cancels or redeems its stock * * * in such manner as to make the distribution and cancellation or redemption * * * essentially equivalent to the distribution of a taxable dividend, the amounts so distributed * * * shall be treated as a taxable dividend.

tion 368, and section 356 regarding "boot" comes into play, it is apparent that the dividend provisions of section 301 must apply.[24]

The difficulty is that this series of steps does not amount to a statutory reorganization. Although several cases have found reorganization upon similar facts under subsection (D) relating to intercorporate transfers of assets with retention of "control," see, e.g., *Heller* v. *Commissioner*, 147 F. 2d 376 (C.A. 9, 1945), affirming 2 T.C. 371 (1943), certiorari denied 325 U.S. 868; *William M. Liddon*, 22 T.C. 1220 (1954), affirmed on this issue 230 F. 2d 304 (C.A. 6, 1956), certiorari denied 352 U.S. 824; *Pebble Springs Distilling Co.*, 23 T.C. 196 (1954), affd. 231 F. 2d 288 (C.A. 7, 1956), certiorari denied 352 U.S. 836, see also *Richard H. Survaunt, supra;* those cases differ from the instant case in one important respect. Respondent specifically renounces subsection (D). This may be because only 72⅔ percent of California's stock was owned by former shareholders of Delaware. In this respect, if no other, the present case is unlike *David T. Grubbs, supra*. "Since the [shareholders of the transferor] owned less than 80 percent of the stock of the new corporations, the acquisition of the assets of the [transferor] is precluded from being a tax-free reorganization within the meaning of section [368(a)(1)(D)]." *Austin Transit, Inc.*, 20 T.C. 849, 856 (1953).

The step-transaction approach makes it possible to view this arrangement as an acquisition of Delaware's assets by California in exchange for California's voting stock to petitioners. But then we must consider that there was also a payment of cash to the retiring 38 percent owned by the estates and widows. Possibly, this is the reason respondent has not attempted to apply subsection (C), relating to the acquisition of assets, "in exchange *solely* for * * * voting stock." (Emphasis added.) *Helvering* v. *Southwest Corp.*, 315 U.S. 194 (1942), rehearing denied 315 U.S. 829, second petition for rehearing denied 316 U.S. 710; *Turnbow* v. *Commissioner*, 368 U.S. 337 (1961); sec. 368(a)(2)(B), 1954 Code.

The remaining arguments for reorganization treatment are even less persuasive. Respondent's own regulation [25] under section 368, section 1.368-1, 2, Income Tax Regs., disposes of respondent's conten-

---

[24] This seems to be respondent's view also. He says in his reply brief:

"* * * The business enterprise may, because of many factors, be subject to change in its form. Where this does not result in a cessation of such business enterprise or a significant diminution in the relationship between the stockholders and their corporate enterprise, a change in the form of the corporate enterprise is not itself considered to be a proper event for taxation; section 368. Any earnings withdrawals in connection with such a mere change in the form of the corporate enterprise are to continue to be subject to the ordinary income rates; 356 and 301."

[25] E.g., "Sec. 1.368-2 Definition of terms.

"(a) The application of the term 'reorganization' is to be strictly limited to the specific transactions set forth in section 368(a). * * *"

**162**

tion on brief that "Reorganization treatment can be ascribed * * * without literal satisfaction of the requirements of Sec. 368." Furthermore, "there was not that reshuffling of a capital structure, *within the framework of an existing corporation*, contemplated by the term 're-capitalization'," [26] as now described in subsection (E). *Helvering* v. *Southwest Corp.*, *supra* at 202. (Emphasis added.) And the shift that occurred in the proprietary interest of the two corporations was hardly the "*mere* change in identity, form, or place of organization" (emphasis added) required [27] by subsection (F). *Stollberg Hardware Co.*, 46 B.T.A. 788 (1942).

We rest the conclusion that there was no reorganization here on the form and content of the reorganization sections, not on the ground that there was no business purpose. See *Gregory* v. *Helvering*, *supra*. We have found several valid business motives here for entering into this transaction, the culmination of which achieved the required objectives. Gallagher received more stock, the members of the management who originally had no stock became shareholders, the inactive 38 percent of Delaware stockholders were eliminated from California, and Cuffe's participation in the control of the business was severely limited. While the large accumulated surplus was distributed, we can hardly say that this was entirely, or even substantially, the sole reason for the transaction. The same features held to constitute a business purpose in *Marjorie N. Dean*, 10 T.C. 19 (1948) (to eliminate inactive women stockholders), and *Wolf Envelope Co.*, 17 T.C. 471 (1951) (to put management in control of the business) exist here.

Section 1.331-1(c), Income Tax Regs., does not interfere with our ultimate conclusion. This regulation adopts the holding of *Richard H. Survaunt*, *supra*. In *Survaunt*, a transaction in which the original corporation was liquidated and the shareholders and directors transferred the assets to a new corporation in exchange for stock was found to be a reorganization under the intercorporate transfer of assets provision of subsection (D) when petitioners failed to prove the absence of a business purpose. The regulation [28] describes similar facts and the underscored language invokes section 356 to cover the distribution of "boot" in pursuance of a plan of reorganization. Since we cannot conclude that the facts in the instant case constitute a re-

<hr />

[26] Sec. 368(a)(1)(E), see footnote 9, *supra*.
[27] Sec. 368(a)(1)(F), see footnote 9, *supra*.
[28] Income Tax Regs.
Sec. 1.331-1 Corporate liquidations.
(c) A liquidation which is followed by a transfer to another corporation of all or part of the assets of the liquidating corporation or which is preceded by such a transfer may, however, *have the effect of the distribution of a dividend or of a transaction in which no loss is recognized and gain is recognized only to the extent of "other property."* See secs. 301 and 356. (Emphasis added.)

organization, the reference to section 356 will not support respondent's position.

Section 1.331–1(c), Income Tax Regs., also cites section 301 as authority. This may be explained as further description of section 356. See[29] section 356(a)(2). Respondent,[30] however, takes the position that the regulation may require dividend treatment in any case of liquidation-reincorporation. It is argued that Congress did not intend a liquidation followed by a reincorporation of the business into a corporation with similar equity interests to be a liquidation within the meaning of section 331, with the result that section 331(b) should not apply.[31] As we have already concluded, however, Congress accorded ordinary income treatment to liquidations only, if at all, in reorganization situations.

We must consequently agree with petitioners. The liquidation of Delaware, although the business was continued by California with considerable change in the corporate structure, falls squarely within the first definition of a partial liquidation.[32] Congress intended that in this situation, any redemption could not be treated as essentially equivalent to a dividend, and that this problem of the continuation of a business must be dealt with, if at all, under the reorganization sections. Since these facts do not fall within the careful language of those sections, the distributions should be treated as payment in exchange for the stock. To find differently would be to enact that provision which has failed on two separate occasions to be enacted by Congress. See H. Conf. Rept. No. 2543, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 41 (1954),[33] and H.R. 4459, 86th Cong., 1st Sess., sec. 26 (1959). See also *Rodman Wanamaker Trust*, 11 T.C. 365 (1948), affirmed per curiam 178 F. 2d 10 (C.A. 3, 1949); *Emma Cramer*, 20 T.C. 679 (1953); *Trianon Hotel Co.*, 30 T.C. 156 (1958).

We accordingly think petitioners correctly treated the cash and property received from Delaware as a payment in exchange for the

---

[29] See footnote 10, *supra*.

[30] See footnote 24, *supra*.

[31] See footnote 14, *supra*.

[32] See footnote 20, *supra*.

[33] "(1) *Liquidation followed by reincorporation.*—The House bill in section 357 contained a provision dealing with a device whereby it has been attempted to withdraw corporate earnings at capital gains rates by, distributing all the assets of a corporation in complete liquidation and promptly reincorporating the business assets. This provision gave rise to certain technical problems and it has not been retained in the bill as recommended by the accompanying conference report. It is the belief of the managers on the part of the House that, at the present time, the possibility of tax avoidance in this area is not sufficiently serious to require a special statutory provision. It is believed that this possibility can appropriately be disposed of by judicial decision or by regulation within the framework of the other provisions of the bill."

Delaware stock redeemed by them. To take account of uncontested adjustments,

*Decisions will be entered under Rule 50.*

Reviewed by the Court.

WITHEY, *J.*, concurs in the result.

PIERCE, *J.*, dissenting:

### I.

Mr. Justice Cardozo, in delivering the opinion of the Supreme Court in *Burnet* v. *Wells*, 298 U.S. 670, said:

One can read in the revisions of the Revenue Acts the record of the government's endeavor to keep pace with the fertility of invention whereby taxpayers had contrived to keep the larger benefits of ownership and be relieved of the attendant [tax] burdens.

* * * At times escape has been blocked by the resources of the judicial process without the aid of legislation. * * * there has been a progressive endeavor by the Congress and the courts to bring about a correspondence between the legal concept of ownership and the economic realities of enjoyment or fruition. * * *

Tax cases in which courts have so used said "resources of the judicial process" to block transparent devices, without the aid of legislation, are numerous. And the methods which the courts have employed in such cases have usually centered: (A) In seeking out the *realities and the substance* of what actually was done—even though the conclusion reached was inconsistent with the self-serving declarations, forms, and book entries of the party involved; and (B) in then so construing and applying the provisions of the revenue statutes as give effect to their underlying *intent and purpose*—even in situations where the techniques utilized had been meticulously directed toward bringing the transactions squarely within the literal words or inert language of the statutory provisions. Included among such cases are the following: *Helvering* v. *Gregory*, 69 F. 2d 809 (C.A. 2), and the Supreme Court's affirming opinion therein, 293 U.S. 465 (wherein the taxpayer was held to have derived a taxable dividend, notwithstanding that she had meticulously sought to bring her transactions within the literal words of the reorganization provisions) ; *Bazley* v. *Commissioner*, 331 U.S. 737 (wherein an alleged "recapitalization" of a business enterprise was rejected, as being "merely a vehicle, however elaborate and elegant, for conveying [corporate] earnings from accumulations to the stockholders") ; and *Weiss* v. *Stern*, 265 U.S. 242 (wherein it was held that "questions of taxation must be determined by viewing what was actually done, rather than the declared purpose of the participants"). See also in this regard: *Helvering* v. *Clifford*, 309 U.S. 331; *Burnet* v. *Wells*, *supra; Knetsch* v. *United States*, 364 U.S. 361; and

*Emanuel M. (Manny) Kolkey*, 27 T.C. 27, affd. (C.A. 7) 254 F. 2d 51.

As was aptly stated by the Court of Appeals for the Fifth Circuit in the recent case of *United States* v. *General Geophysical Co.*, 296 F. 2d 86, certiorari denied 369 U.S. 849 :

tax avoidance implications do not constitute a license to courts to distort the laws or to write in new provisions; they do mean that we should guard against giving force to a purported transfer which gives off an unmistakably hollow sound when it is tapped. * * *

Through all of the above-mentioned cases, there runs a common thread of purpose. In my view, the doctrines embodied therein should have been given effect by this Court in the instant case.

## II.

The transactions here involved are typical of a plan which is frequently designated as a "liquidation-reincorporation." The essential feature of such a plan is to split an incorporated business enterprise which in reality continues to carry on an uninterrupted going business, into two separate juristic units through obtaining a new corporate charter; to regard each of such juristic units as a separate "taxpayer"; and then to draw off the accumulated earnings and profits that are segregated into one of the juristic units, as distributions in "liquidation," with a view to obtaining the benefit of having the same regarded as capital gains, rather than as ordinary dividends.

Such "liquidation-reincorporation" device was given attention by Congress during its enactment of the Internal Revenue Code of 1954 and it was there regarded as an avenue for tax avoidance. The House Bill for said Code (in section 357 thereof) originally contained a special statutory provision designed to block such device; but later, this provision was eliminated with the explanation that the possibility of such tax avoidance could "appropriately be disposed of by *judicial decision* or by *regulation* within the framework of the other provisions of the bill."[1]  (Emphasis supplied.)   And thereupon, the Treasury gave effect to such Congressional suggestion, by so wording its regulations pertaining to corporate liquidations (Income Tax Regs., sec. 1.331–1(c)) as to provide that where a "liquidation" is either followed or preceded by a transfer of all or part of the assets of the "liquidating" corporation, such transfer "may have the effect of the distribution of a dividend." See also with regard to such device, the article by Ralph S. Rice in 8 Stanford Law Review 258 (1956), entitled "When Is a Liquidation Not a Liquidation for Federal Tax Purposes?"

---

[1] H. Conf. Rept. No. 2543 to accompany H.R. 8300, 83d Cong., 2d Sess., p. 41.

In the instant case what happened, in substance, was this. The business enterprise had been incorporated in 1946 under a Delaware charter, to engage in business as a stevedoring contractor in the San Francisco area. Its operations proved to be very successful; and up until the close of its fiscal year ended in May 1955, its aggregate annual incomes totaled more than $1 million. But it had paid dividends in only 2 years, with the result that it had accumulated earnings and profits aggregating between $800,000 and $900,000, as compared with paid-in capital of only $156,000.

There are indications in the record that the retention of this large accumulation of earnings and profits was not necessary to the operations of the business. The company owned no plant or real estate, but performed most of its contractual services while operating as a licensee on ship wharves owned by others. The tools employed in rendering its services consisted principally of cranes, trucks, and other cargo-handling equipment—most of which it had acquired in secondhand condition and were about 10 years old. Collections for the cargo-handling services were normally received within about 30 to 45 days after completion of the work. And the principal expense incurred in the interim was the weekly payroll for the stevedores and other employees, which normally was met through use of a line of credit arranged with a San Francisco bank. As early as 1953, the president of the company conferred with an attorney regarding the possibility of penalties being imposed under the Federal tax statutes, by reason of said large accumulation of earnings and profits; but nothing was then done with respect to the matter. Also it is to be observed that, even after the distribution of over $1 million (here in dispute) was made in 1955 and 1956, the business continued to produce even larger annual net incomes than had been produced in any previous taxable year.

By 1955, there were two new developments, each of which pertained principally to the shareholders as distinguished from the company's own business operations. Certain shareholders who formerly had been active in the business had died; and their shares had passed into the hands of estates and widows who desired to have their equities redeemed. And, there were certain employees of the company who desired to make stock investments in the profitable enterprise. Both of these new developments might have been met without making any changes or substitution of the existing charter, i.e.: By simply redeeming the shares of the estates and widows out of the existing capital and surplus; and by issuing new shares of stock to the employees, either out of the then available unissued corporate stock, or by reissuing the shares redeemed from the estates and widows. But the difficulty of issuing new shares was that, if new stock were sold

to the employees before the above-mentioned large accumulation of earnings and profits were paid out as dividends, the price of the shares sold would have to reflect the accumulations. And on the other hand, if the accumulations were first distributed, the result would be that, although the estates and widows who surrendered *all* their shares through redemption might derive capital gain, the four present petitioners who continued their investments in the enterprise, would unquestionably derive fully taxable dividends. Thus, the real difficulty existing in 1955 was not how to provide for the business needs of the continuing prospering enterprise, but rather how to distribute the large accumulation of earnings and profits without dividend consequences to the four present petitioners.

It was in this situation that there was then developed and put into effect the so-called "liquidation-reincorporation" technique—which the four present petitioners contended was sufficient to enable them to withdraw assets, including their proportionate interests in the large accumulation of earnings and profits, through a purported "liquidation" of the old juristic unit, so as to yield them capital gains, rather than dividends.

### III.

In my view, the use of the "liquidation-reincorporation" device in the present case, should have been blocked by this Court through employment of the above-mentioned "resources of the judicial process"—by applying the doctrine of the several authorities cited in the first part of this dissenting opinion.

Here, there was no actual or bona fide "liquidation" of the incorporated business enterprise which had produced the accumulated earnings and profits. Actually, the business was never wound up or discontinued; and the four present petitioners actually never discontinued either their investments or their managerial activities therein. After the acquisition of the new California charter, the going business of the enterprise proceeded as before, without any interruption, under substantially the same name, at the same business locations, rendering services to the same customers under the same contracts, employing the same tools and cargo-handling equipment, and with the same officers and key employees.

As regards the statutes upon which the petitioners have placed reliance, it is significant that the term "liquidation" is not defined therein. In this regard, the situation is similar to that in the *Bazley* case wherein the Supreme Court pointed out that the term "recapitalization" had not been statutorily defined. The Supreme Court therein stated that in such situation it would not attempt to supply a definition of its own, but rather would determine what does *not* come within the concept of the term in controversy—by observing the underlying pur-

pose of Congress. The Supreme Court then further said, in speaking of the reorganization provisions of the statute, which it refused to apply in that case:

It was not the purpose of the reorganization provision to exempt from payment of a tax what as a practical matter is realized gain. * * * there are circumstances where a formal distribution * * * represents merely a new form of the previous participation in an *enterprise,* involving no change of substance in the rights and relations of the interested parties one to another or to the corporate assets. As to these, Congress has said [see as to the 1954 Code, section 368(a)(1)(F) thereof] that they are *not to be deemed significant occasions* for determining taxable gain.

    *          *          *          *          *          *          *

* * * In the case of a corporation which has undistributed earnings, the creation of new corporate obligations which are transferred to stockholders in relation to their former holdings, so as to produce, for all practical purposes, the same result as a distribution of cash earnings of equivalent value, cannot obtain tax immunity because cast in the form of a *recapitalization-reorganization.* * * * [Emphasis supplied.]

In my view, the present petitioners and also the majority of this Court have placed too much reliance on the shift of the corporate charter from Delaware to California, a change which apparently had no substantial effect on the uninterrupted operations of the going business, and too much reliance also on the fact that certain employees who had not previously been stockholders, invested $82,000 in the profitable business which did not lack or need additional financing. I think rather, that greater emphasis should have centered on the *realities* of what actually was done; and upon the *continuity of the business enterprise* in which investments of the present petitioners remained in solution. See in this connection, *Helvering* v. *Gregory, supra,* wherein, as hereinbefore pointed out, both the Second Circuit and the Supreme Court disregarded the creation of a new juristic entity, and also declined to apply the reorganization provisions of the statute, in seeking out the reality of what actually had been done. See also, *Libson Shops, Inc.* v. *Koehler,* 353 U.S. 382, wherein the "continuity of business enterprise" principle was applied, in lieu of the *entity concept* which had theretofore been applied by this and other courts in similar cases, in determining whether the "taxpayer" which sought to deduct net operating losses incurred in prior years, was the same "taxpayer" which had sustained such losses. And see further, *Huyler's,* 38 T.C. 773, wherein this same "continuity of business enterprise" principle was applied by this Court.

It is my opinion that said "continuity of business enterprise" principle should likewise have been applied in the instant case; that the changes made in respect of the present continuing business enterprise were too unsubstantial to have the effect of creating a new and sep-

arate "taxpayer"; and that (to use the words of the Supreme Court in the *Bazley* case) the transactions here involved were "merely a vehicle, however elaborate and elegant, for conveying [corporate] earnings" from accumulations to the present petitioners.

I would have sustained the determinations of the Commissioner that these petitioners realized taxable dividends.

RAUM and ATKINS, *JJ.*, agree with this dissent.