TELEPHONE ANSWERING SERVICE CO., INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1544-69.    Filed December 24, 1974.

*John S. McDaniel, Jr., Calhoun Bond,* and *Lawrence A. Kaufman,* for the petitioner.

*Eli H. Schmukler,* for the respondent.

### OPINION

TANNENWALD, *Judge:* Respondent determined deficiencies of $8,527.55 and $72,329.02 in the Federal income taxes of petitioner, which filed consolidated returns, for the taxable years ended November 30, 1965, and November 30, 1966, respectively. Concessions having been made, the sole issue for determination is whether the gain realized by petitioner on the sale of all the stock of one of its subsidiaries to a third party is to be recognized. The resolution of this issue depends upon whether the factual pattern

involved herein meets the requirements of section 337.[1]

All of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Petitioner Telephone Answering Service Co., Inc. (TASCO), was a corporation organized under the laws of the State of Maryland with its principal office at 1615 Court Square Building, Baltimore, Md.

For the taxable year ended November 30, 1965, TASCO and its two subsidiaries, Telephone Answering Service, Inc.—a corporation organized under the laws of the State of Texas with its principal office at 3317 Montrose Boulevard, Houston, Tex. (hereinafter referred to as Houston)—and North American Answering Service, Inc.—a corporation organized under the laws of the State of Maryland with its principal office at 1615 Court Square Building, Baltimore, Md. (hereinafter referred to as North American)—filed a consolidated income tax return with the district director of internal revenue at Baltimore, Md. For the taxable year ended November 30, 1966 (in the case of Houston covering only the period ended October 31, 1966), TASCO and its subsidiaries, North American, Houston, Telephone & Radio Answering Service Co., Inc.—a corporation organized under the laws of the State of Maryland with its principal office at 1615 Court Square Building, Baltimore, Md. (hereinafter referred to as New TASCO)—and Telephone & Radio Answering Service Co., Inc.—a corporation organized under the laws of the State of Texas with its principal office at 3317 Montrose Boulevard, Houston, Tex. (hereinafter referred to as Radio)—filed a consolidated income tax return with the district director of internal revenue at Baltimore, Md.

TASCO was organized on November 14, 1950, under the name of Doctors' Telephone Exchange, Inc. In February 1961, the corporation's name was changed to Doctors' Telephone Exchange & Physicians' Telephone Exchange, Inc.

TASCO operated various telephone-answering services under the aforesaid name until June of 1961, at which time an agreement was entered into between Doctors' Telephone Exchange & Physicians' Telephone Exchange, Inc., William A. Houser (hereinafter referred to as Houser), Alex Brown & Sons (acting

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

for undisclosed principals), and Walter Lohr whereby the stock of Houston was to be acquired. To carry out this acquisition of stock, the certificate of incorporation of Doctors' Telephone Exchange & Physicians' Telephone Exchange, Inc., was again modified so that the corporation's name became Telephone Answering Service Co., Inc., and the number of shares of authorized stock was increased from 50,000 to 1 million. On June 30, 1961, 38,370 shares of TASCO stock were issued to Houston shareholders in exchange for 21,000 shares (100 percent) of Houston stock.

In January 1962, North American was incorporated and TASCO acquired all of its originally issued capital stock. During 1962, North American acquired telephone-answering services located in Bala-Cynwyd, a suburb of Philadelphia; in Joliet, a suburb of Chicago; and in Cleveland Heights, a suburb of Cleveland, Ohio. In addition, North American's charter was changed so that it could provide radio-telephone services.

By mid-year 1962, TASCO was operating telephone-answering services in the vicinity of Baltimore, Md., and its suburbs and was the sole stockholder of two corporations: North American, which operated telephone-answering services in the suburbs of Philadelphia, Chicago, and Cleveland; and Houston, which operated telephone-answering services in the Houston, Fort Worth, and Pasadena areas of Texas. With minor exceptions, the officers, directors, areas of operation, and type of services provided by TASCO, Houston, and North American remained unchanged from mid-1962 until the years in issue.

By mid-year 1962, TASCO had between 40 and 50 shareholders. With the exception of the acquisition by TASCO during the period 1962 to 1967 of about 10 percent of its own outstanding stock in a number of unrelated purchases, there was no change in the number of shareholders or the amount of their holdings until all of the stock of TASCO was reacquired in April 1967. From 1962 until his stock was reacquired in April 1967, Houser held approximately 15.7 percent of the outstanding stock of TASCO.

During the period from 1962 until April of 1967, TASCO received income from two sources. First, it received income as a result of providing telephone-answering services in the Baltimore vicinity. In addition, TASCO received income as the result of having contracts with North American and Houston whereby TASCO provided management services to both corporations in

exchange for management service fees. These were the only sources of income to TASCO, since neither Houston nor North American ever declared or paid a dividend.

In June of 1965, TASCO was contacted by representatives of the General Waterworks Corp. with respect to the possibility of its acquiring the stock and obligations of Houston. Negotiations were begun and in January of 1966 it was proposed that General Waterworks acquire the stock and debt of Houston in exchange for cash. On February 15, 1966, a meeting was held between representatives of TASCO and General Waterworks to discuss the possible sale of the Houston stock and debt to General Waterworks.

Negotiations between TASCO and General Waterworks regarding the sale of the Houston stock and debt continued throughout March until, in late April 1966, a general agreement was reached on the details of the sale. While there were some negotiations conducted with respect to the purchase by General Waterworks of North American's Bala-Cynwyd telephone-answering service and some minor discussions regarding the sale of some other answering services, there was no substantial effort made by TASCO to dispose of all of the answering services and stock held by it. Meanwhile, on March 18, 1966, TASCO formed New TASCO, as a new subsidiary, then called Telephone & Radio Answering Service Co., Inc.—Maryland.

On May 13, 1966, at a meeting of the board of directors of TASCO both a plan, entitled "Plan of Complete Liquidation and Dissolution of Telephone Answering Service Co., Inc.," and a contract covering the sale of the stock and debt of Houston to General Waterworks were approved.

On June 8, 1966, TASCO formed another new subsidiary, Telephone & Radio Answering Service Co., Inc.—Texas (Radio).

On October 18, 1966, New TASCO issued 20,000 shares of its stock to TASCO in exchange for cash. This cash was subsequently transferred by New TASCO to Radio in exchange for 100 percent of the stock of that corporation. Radio then used the proceeds of this stock issue to purchase from Houston certain radio-telephone licenses which had been issued by the Federal Communications Commission (FCC). FCC regulations required that its approval be obtained before radio-telephone licenses could be transferred. Rather than delay the transfer of the Houston stock and debt to General Waterworks, TASCO went through the previously

described steps so that the radio-telephone licenses could be maintained in its control pending FCC approval of the transfer to General Waterworks and the remainder of the assets of Houston could immediately be placed under the control of General Waterworks by the transfer of the Houston stock by TASCO. Once FCC approval was obtained, the Radio stock, which was held by TASCO through its subsidiary, New TASCO, was sold to General Waterworks.

The stock of and debt owing by Houston was sold by TASCO to General Waterworks on October 31, 1966. As a result of this sale, TASCO realized a gain of $268,994.85. This realized gain is computed as follows:

| | | |
|---|---:|---:|
| Selling price | | $723,675.00 |
| Less: Original cost | $383,700.00 | |
| Legal and accounting fees | 7,615.00 | |
| Accounts receivable from Houston | 63,365.15 | [1]454,680.15 |
| Gain on sale | | 268,994.85 |

[1] We note that TASCO claimed the amount of $550,880.39 as the cost of its Houston stock on its consolidated Federal income tax return for the fiscal year ended Nov. 30, 1966. The difference between the stipulated figure and the reported figure is unexplained.

TASCO had management service contracts with both Houston and North American. Pursuant to the terms of these contracts, TASCO was to receive a fee equal to 2 percent on the collection of each corporation's accounts receivable. TASCO's management service contract with Houston terminated on October 31, 1966, the date of the sale of the stock and debt to General Waterworks. The management service contract between TASCO and North American terminated on November 30, 1966. A new management agreement based on a fee equal to 8 percent of the accounts receivable was entered into between North American and New TASCO on December 1, 1966.

On March 27, 1967, New TASCO authorized and issued an additional 65,025 shares of stock to TASCO in exchange for which TASCO, on March 31, 1967, transferred to New TASCO all of the assests needed to operate its telephone-answering services in the Baltimore area, all of the assets needed to provide management services, certain other assets, and all of its obligations. The only assets not transferred by TASCO to New TASCO on March 31, 1967, were the North American stock, the New TASCO stock, and cash in the amount of $722,712.50. New TASCO's income was thus derived from providing telephone-answering services in

Baltimore and its suburbs and from providing management services to North American.

On March 27, 1967, North American authorized and issued 85,025 shares of its stock to TASCO in exchange for the 1,000 shares of its outstanding stock which were currently held by TASCO (100 percent).

On April 19, 1967, TASCO distributed to its shareholders all of the cash, North American stock (100 percent), and New TASCO stock (100 percent) held by it.

On April 28, 1967, 1 or 2 days after the Articles of Dissolution of TASCO were filed with the State of Maryland, New TASCO, which had been operating under the name of Telephone & Radio Answering Service Co., Inc., changed its name to Telephone Answering Service Co., Inc., the same name used by TASCO.

On January 20, 1967, the management of North American was authorized by its board of directors to negotiate with Houser, the holder of approximately 15.7 percent of the outstanding stock of TASCO, for the purchase by him of the telephone-answering services run by North American in Joliet, Ill. On January 31, 1967, Houser submitted an offer to North American to purchase the Joliet answering services. In March 1967, an agreement with respect to this purchase by Houser was approved by the directors of North American. During April 1967, Houser resigned as an officer and director of TASCO. Simultaneous with his resignation, North American transferred its Joliet, Ill., operation to Houser in exchange for all the New TASCO and North American stock held by him. North American subsequently transferred the New TASCO stock which it received to New TASCO in exchange for the cancellation of part of a previously assigned debt.

Throughout the years 1965 and 1966, North American continued to service its customers (with the exception of those in the Joliet, Ill. area) without the slightest interruption in service. Upon the transfer of TASCO's assets to New TASCO, New TASCO took over the telephone-answering service operations which were previously operated by TASCO. The customers were never notified that they were being serviced by a different organization.

New TASCO's offices were identical with those which had previously been used by TASCO. Since New TASCO's address and telephone numbers were identical with those used by TASCO, New TASCO continued to use the stationery which had formerly been used by TASCO. The forms used by New TASCO to communicate

with customers were identical to those previously used by TASCO. No effort was made by New TASCO to alter any of the procedures for dealing with customers.

New TASCO did obtain a new employee identification number and did secure new bank accounts; however, the bank accounts were maintained in the same lending institutions and, although the unemployment insurance account number was new, the experience rating of New TASCO was identical with that formerly given TASCO. With the exception of Houser, all of the persons employed by New TASCO were identical with those who had been employed by TASCO.

The shareholders of New TASCO, who numbered approximately 40 to 50, were, with the exceptions enumerated below, identical both in number, name, and percentage of ownership with those who were the shareholders of TASCO from approximately mid-year 1962 until it filed Articles of Dissolution in April 1967. The only significant difference in the ownership of New TASCO, as compared with that of TASCO, was that Houser, the owner of 15.7 percent of the TASCO stock and 15.7 percent of the New TASCO stock, immediately upon New TASCO's acquisition of TASCO's assets, transferred his New TASCO stock to North American in an exchange previously described. Therefore, Houser was a shareholder of New TASCO for a minimal period of time. There were, however, some minor reacquisitions of stock by New TASCO. The reacquired New TASCO stock was held by nine people and amounted to less than 5 percent of the total stock outstanding. This stock was reacquired at the rate of $1.50 per share. Identical reacquisitions were made by North American at the rate of $2.50 per share. The parties have stipulated that no significant changes in the percentage of ownership of New TASCO or North American were brought about by the aforesaid stock reacquisitions.

TASCO's, Houston's, and North American's receipts and income as reported for the fiscal year ended November 30, 1965, are as follows:

| | TASCO | Houston | North American |
|---|---|---|---|
| Gross receipts from telephone-answering services _____ | $194,343.26 | $685,854.37 | $319,090.39 |
| Management fees _____ | [1]60,148.45 | | |
| Other income_____ | 4,486.69 | 1,502.88 | 3,578.57 |
| Total income _____ | 258,978.40 | 687,357.25 | 322,668.96 |
| Total deductions _____ | 239,056.69 | 674,580.43 | 308,948.86 |
| Net income before taxes and net operating loss deduction __ | 19,921.71 | 12,776.82 | [2]13,720.10 |

[1] Of this amount, $53,539.07 was paid by Houston and $6,609.38 was paid by North American.

[2] North American claimed a net operating loss deduction of $43,154.11, which turned a taxable income of $13,720.10 into a loss of $29,434.01.

TASCO's, Houston's, and North American's receipts and income as reported for the fiscal year ended November 30, 1966 (ended October 31, 1966, for Houston) are as follows:

| | TASCO[1] | Houston | North American |
|---|---|---|---|
| Gross receipts from telephone-answering services _____ | $187,203.02 | $701,756.83 | $333,362.87 |
| Management fees _____ | [2]74,625.71 | | |
| Other income_____ | 24,915.99 | 254.52 | 3,585.03 |
| Total income _____ | 286,744.72 | 702,011.35 | 336,947.90 |
| Total deductions _____ | 243,702.46 | 681,007.56 | 315,491.93 |
| Net income before taxes _____ | 43,042.26 | 21,003.79 | 21,455.97 |

[1] The sale of TASCO's Houston stock to General Waterworks is reflected on the return for this year but no gain on the sale is included in income.

[2] Of this amount, $68,116.05 was paid by Houston and $6,509.66 was paid by North American.

TASCO's balance sheets as reported for the fiscal years ended November 30, 1965, and November 30, 1966, are as follows:

| | 1965 | 1966 |
|---|---|---|
| *Assets* | | |
| Current assets: | | |
| Cash _____ | $20,764.15 | $49,490.14 |
| Trade accounts receivable–net _____ | 3,748.76 | 17,294.35 |
| Escrow funds _____ | – – – | 50,000.00 |
| Prepaid expenses_____ | 90.89 | 2,427.70 |
| Short-term marketable securities (at cost and accrued interest) _____ | – – – | 695,591.58 |
| Total current assets _____ | 24,603.80 | 814,803.77 |

| Subsidiary companies: | | |
|---|---|---|
| Investment in capital stock | $558,700.00 | $205,000.00 |
| Notes and accounts receivable | 128,335.61 | 13,031.54 |
| | 687,035.61 | 218,031.54 |
| Other assets: | | |
| Advance to officer | 2,500.00 | |
| | 2,500.00 | |
| Furniture and equipment: | | |
| Furniture and equipment–at cost | 17,577.21 | 21,551.62 |
| Less allowances for depreciation | 7,790.85 | 12,511.79 |
| | 9,786.36 | 9,039.83 |
| Leasehold improvements, less amortization | 709.20 | 627.88 |
| | 10,495.56 | 9,667.71 |
| Intangibles: | | |
| Covenants not to compete | 28,789.70 | 124.94 |
| Other intangibles | 25,336.84 | 25,336.84 |
| | 54,126.54 | 25,461.78 |
| Deferred charges: | | 2,773.60 |
| | 778,761.51 | 1,070,738.40 |

### *Liabilities*

| Current liabilities: | | |
|---|---|---|
| Trade accounts payable | 3,611.97 | 11,276.15 |
| Compensation and related taxes | 7,005.37 | 6,123.34 |
| Taxes on income–estimated | 4,861.98 | 29,485.15 |
| Current maturities of long-term debt | 3,625.00 | |
| Total current liabilities | 19,104.32 | 46,884.64 |
| Stockholders' equity: | | |
| Capital stock | 89,255.00 | 94,270.00 |
| Capital in excess of par value of capital stock | 660,330.00 | 660,330.00 |
| Retained earnings | 56,722.19 | 372,868.76 |
| Less amount over par value for | | |
| capital stock in treasury | (46,650.00) | (103,615.00) |
| | 759,657.19 | 1,023,853.76 |
| | 778,761.51 | 1,070,738.40 |

On its consolidated corporate Federal income tax return for the taxable year ended November 30, 1966, TASCO reported a gain of $172,794.61 from the sale of its Houston stock but did not include said amount in its income because of the nonrecognition provisions of section 337. In his notice of deficiency, respondent determined that the realized gain on the sale was $268,994.85

and that such gain was taxable because "there was not a distribution of [TASCO's] assets in complete liquidation necessary to bring the sale within the nonrecognition of gain provisions of section 337."

Petitioner (TASCO) was a corporation engaged, directly and through its wholly owned subsidiaries (Houston and North American), in the operation of telephone-answering services in various parts of the country. In addition, TASCO provided managerial services to Houston and North American. TASCO was approached by an unrelated party desiring to purchase the Houston operation. Willing to part with its subsidiary, but unwilling to be taxed on the gain it would realize thereby, TASCO planned and executed within a 12-month period this series of transactions: It adopted a "Plan of Complete Liquidation and Dissolution," then sold the Houston stock for cash. Next, it transferred all of its directly owned business assets to a recently organized subsidiary (New TASCO) in exchange for that corporation's stock. Finally, TASCO dissolved, distributing pro rata among its shareholders the cash it received from the sale of Houston plus the North American and New TASCO stock.[2]

Petitioner claims that following these steps it was completely liquidated, and therefore section 337 [3] requires nonrecognition of the gain realized on its sale of Houston. We disagree, and hold that the requirements of that section have not been satisfied.[4]

---

[2] A substantially contemporaneous exchange resulted in the transfer of one of North American's businesses to William A. Houser, a 15.7-percent shareholder of TASCO, in redemption of all of his stock in North American and New TASCO.

[3] The pertinent portion of that section is as follows:

SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS.

(a) GENERAL RULE.—If—

(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

(2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,

then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

[4] Although the notice of deficiency merely denied the applicability of sec. 337, respondent in this Court concentrates principally on the argument that the instant transaction was a reorganization meeting the requirements of secs. 354 and 368(a)(1)(D). We find it unnecessary to reach this issue, particularly with regard to the question whether New TASCO acquired "substantially all" of TASCO's assets, and we express no opinion as to its proper resolution. Similarly, we do not consider the proposition, disavowed by respondent, that the exchange should be treated in whole or in part as a divisive reorganization qualifying under sec. 355. In this context, we emphasize that we are dealing herein with the question of nonrecognition of gain *at the corporate* level and not with the tax consequences of the transactions *at the shareholder level;* in view of the complexities

Our decision is founded on both the history and the purpose of the statute.

Section 337 was first enacted as part of the 1954 Code. It was intended by Congress to avoid the "shadowy and artificial" distinction between a closely held corporation and its shareholders required by *Commissioner v. Court Holding Co.,* 324 U.S. 331 (1945), and *United States v. Cumberland Public Service Co.,* 338 U.S. 451 (1950), when corporate assets are sold during liquidation. See H. Rept. No. 1337, 83d Cong., 2d Sess., pp. 38, A106 (1954); S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 48, 258 (1954). That section permits the avoidance of a double tax by allowing nonrecognition of gain at the corporate level, without the *Court Holding-Cumberland* requirement of proving that the shareholders, not the corporation, made the sale. Congress placed a price on nonrecognition, however, which is that the sale shall be followed by complete liquidation.

The Internal Revenue Code does not define a complete liquidation. Clearly, the term conveys more than the formal dissolution of a corporation under State law. *Pridemark, Inc. v. Commissioner,* 345 F.2d 35, 41 (C.A. 4, 1965). In contrast with some other parts of the Code (compare, e.g., secs. 331 and 336), section 337 is hedged with specific provisions designed to describe, at least in outline, the complete liquidations entitled to its benefits. The sale and distribution must be preceded by the adoption of a "plan of complete liquidation." More importantly, "*all of the assets* of the corporation" (less assets retained to meet claims) must be "*distributed* in complete liquidation." (Emphasis added.) This language evidences an intent to require a bona fide elimination of the corporate entity and does not include a transaction in which substantially the same shareholders continue to utilize a substantial part of the directly owned assets of the same enterprise in uninterrupted corporate form.[5] See fn.

involved in determining those consequences, under a variety of permutations and combinations, it is conceivable that they might be subjected to a different analysis. See *Kansas Sand & Concrete Co.,* 56 T.C. 522, 530 (1971), affd. 462 F.2d 805 (C.A. 10, 1972). Compare *May B. Kass*, 60 T.C. 218 (1973), affirmed without opinion 491 F.2d 749 (C.A. 3, 1974). Compare also *Estate of Henry P. Lammerts,* 54 T.C. 420, 447 et seq. (1970) (dissenting opinion).

[5] This interpretation is supported by Congress' failure to make sec. 337 applicable to sales of property in connection with partial liquidations and nonliquidating distributions, in which the corporate form is retained, despite the possibility of the same "double tax" dilemma arising as with complete liquidations. See secs. 311, 336; *Waltham Netoco Theatres, Inc.,* 49 T.C. 399 (1968), affd. 401 F.2d 333 (C.A. 1, 1968). Sec. 333 of the House

14 *infra.*

The record therein demonstrates that TASCO sought to avoid the recognition of gain on the sale of Houston. But, the presence or absence of a tax avoidance objective is irrelevant in determining what is a "complete liquidation" for tax purposes. *United States v. Cumberland Public Service Co., supra* at 455. While a complete liquidation is a prerequisite to the application of section 337, the mere adoption of a plan denominated as one of "complete liquidation" and purported compliance therewith does not preclude further inquiry on our part. It is the reality and substance of the liquidation that counts. Compare *Lewis v. Commissioner,* 176 F.2d 646, 649-650 (C.A. 1, 1949). See also *Gregory v. Helvering,* 293 U.S. 465 (1935).

In *Pridemark, Inc. v. Commissioner, supra,* the Fourth Circuit stated (345 F.2d at 41):

The corporation must have ceased to be a going corporate concern, or if the enterprise is continued in corporate form, the shareholder must have disassociated himself from it. See Regs. 1.332-2(c) (1955). If the liquidated business is not resumed by the new corporation as a continuation of a going concern, there is a "complete liquidation."

Similarly, in *Davant v. Commissioner,* 366 F.2d 874, 882 (C.A. 5, 1966), modifying 43 T.C. 540 (1965), the Fifth Circuit stated: "Those provisions [dealing with complete liquidation] contemplate that the operating assets will no longer be used by the stockholders to carry on the business as a corporation." See also *Lewis v. Commissioner, supra* at 649.[6] Both *Court Holding Co.* and *Cumberland Public Service Co.,* which prompted the adoption of section 337, involved the sale of a corporate enterprise and the termination of the shareholders' interest in the business. It is not without significance that the Supreme Court, in the latter case, specifically distinguished gains in the course of a "genuine liquidation" from those of a "going concern." See 338 U.S. at 454-455. Moreover, during its consideration of the Internal Revenue Code of 1954, the House Ways and Means Committee stated:

a corporation will be deemed to have completely liquidated even though the business previously carried on by it is continued in partnership or sole

---

bill would have extended nonrecognition treatment to partial liquidations; the limitation to complete liquidations originated in the Senate Finance Committee. See S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 258-259 (1954).

[6] See *Estate of John L. Bell,* T.C. Memo. 1971-285.

proprietorship *or other noncorporate form.* [Emphasis added. H. Rept. No. 1337, 83d Cong., 2d Sess., p.A112 (1954).] [7]

Clearly, the transactions under consideration herein did not meet the foregoing standards. The businesses which petitioner directly operated were continued without interruption by New TASCO, with substantial continuity of shareholder interest. The only result of the transaction was to place the North American stock and a sizable amount of cash in the shareholders' hands. New TASCO was merely the alter ego of petitioner with respect to all of its directly owned business assets; its formation and utilization served no purpose other than masking a distribution as one in complete liquidation. It is possible that the transactions can be treated as accomplishing a partial liquidation of petitioner within the meaning of section 346. We express no opinion on this score because, even if the requirements of a partial liquidation were found to have been met, section 337 would not apply. That section requires a "complete liquidation." See fn. 10 *supra.* Compare Rev. Rul. 60-50, 1960-1 C.B. 150. The transitory coexistence of TASCO and New TASCO does not support the conclusion that the subsequent but prearranged liquidation of the former effected a sufficient transmutation of the assets of petitioner out of corporate solution to satisfy the requirement of section 337 that "all of the assets of the corporation" be distributed. To hold for the petitioner in the instant case would frustrate the congressional purpose to deny section 337 treatment in connection with distributions of ongoing corporations. We cannot give tax effect to the "mere shifting of charters," *Helvering v. Elkhorn Coal Co.,* 95 F.2d 732, 734 (C.A. 4, 1938), masquerading as a complete liquidation.

The facts before us are unlike those in *Breech v. United States,* 439 F.2d 409 (C.A. 9, 1971), and *Hyman H. Berghash,* 43 T.C. 743 (1965), affd. 361 F.2d 257 (C.A. 2, 1966). Those cases applied section 337 to liquidation-reincorporation transactions in which the continuity of shareholder interest between the old and new corporations was insufficient to satisfy the definition of a

---

[7] See also H. Rept. No. 1337 at pp. A106-A107; S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 48-49, 258-259. The House bill contained, in sec. 336, definitions of complete and partial liquidations, which required inter alia a plan "under which the *termination of the business* or businesses and the *transfer of assets in redemption* of all or part of the stock is authorized." (Emphasis added.)

statutory reorganization.[8] It was felt inappropriate to deny the existence of a complete liquidation where Congress had found the shift in ownership adequate to justify considering the transferee as a new, rather than a continuing, enterprise. Compare *Estate of Henry P. Lammerts,* 54 T.C. 420 (1970), remanded per curiam on another issue 456 F.2d 681 (C.A. 2, 1972); *Joseph C. Gallagher,* 39 T.C. 144 (1962). Where such divergence in shareholder interest does not exist and the transferee corporation continues the business of the transferor, the courts have consistently held that no complete liquidation occurs. *American Manufacturing Co.,* 55 T.C. 204 (1970); *Mark E. DeGroff,* 54 T.C. 59 (1970), affirmed per curiam 444 F. 2d 1385 (C.A. 10, 1971); *Ralph C. Wilson, Sr.,* 46 T.C. 334 (1966); *South Texas Rice Warehouse Co.,* 43 T.C. 540 (1965), affirmed in part and reversed in part sub nom. *Davant v. Commissioner, supra; James Armour, Inc.,* 43 T.C. 295 (1964); *John G. Moffatt,* 42 T.C. 558 (1964), affd. 363 F.2d 262 (C.A. 9, 1966).

Here, immediately after the dissolution of TASCO both of its directly owned businesses were continued by New TASCO, and, even if the contemporaneous, but apparently unrelated, redemption of the Houser shares (see fn. 7 *supra*) is taken into account, there remains a degree of shareholder continuity in excess of 84 percent. In short, petitioner has not satisfied the requirements of section 337.[9]

To reflect the concessions of the parties on other issues,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, *J.,* dissenting: As argued by the parties the issue presented to the Court is whether the sale in question was made pursuant to a plan of complete liquidation as contended by

---

[8] In *Breech,* the Court rested its decision on the ground that the attribution rules do not apply to reorganizations. See 439 F.2d at 411. See also *Hyman H. Berghash,* 43 T.C. 743, 757 (1965), affd. 361 F.2d 257 (C.A. 2, 1966). We also note that in *Berghash,* the parties had stipulated that a "complete liquidation" had taken place. See 43 T.C. at 759.

[9] Nothing we have said should be construed as holding that sec. 337 does not apply where one corporate tier is eliminated through the complete liquidation of a parent corporation and no directly held assets of the parent corporation remain in corporate solution. Nor do we necessarily preclude the applicability of sec. 337 where the amount of such assets remaining in corporate solution can be said to be de minimis. Compare *Mountain Water Co. of La Crescenta,* 35 T.C. 418, 428 (1960); Rev. Rul. 66-284, 1966-2 C.B. 115.

petitioner or was merely part of an integrated transaction constituting a reorganization as maintained by respondent.

Specifically respondent asserts that the entire transaction qualifies as a reorganization within the meaning of sections 368(a)(1)(D) and 354.[1] I would hold otherwise on the grounds that the legislative history[2] makes it quite clear that section 354(b) was not designed to cover divisive reorganizations (a split-up in this case).

This Court has faced before, on several occasions, the issue of how to categorize a transaction that does not meet the requirements of the reorganization provisions. In *Joseph C. Gallagher,* 39 T.C. 144 (1962), we said:

The liquidation of Delaware, although the business was continued by California with considerable change in the corporate structure, falls squarely within the first definition of a partial liquidation.[32] Congress intended that in this situation, any redemption could not be treated as essentially equivalent to a dividend, and that *this problem of the continuation of a business must be dealt with, if at all, under the reorganization sections. Since these facts do not fall within the careful language of those sections, the distributions should be treated as payment in exchange for the stock.* To find differently would be to enact that provision which has failed on two separate occasions to be enacted by Congress. See H. Conf. Rept. No. 2543, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 41 (1954),[33] and H.R. 4459, 86th Cong., 1st Sess., sec. 26 (1959). [39 T.C. at 163; fns. omitted; emphasis added.]

Our *Gallagher* approach was approved in *Commissioner v. Berghash,* 361 F. 2d 257, 260 (C.A. 2, 1966), affirming 43 T.C. 743 (1965). See also *Estate of Henry P. Lammerts,* 54 T.C. 420 (1970), affirmed per curiam in part and remanded per stipulation 456 F. 2d 681 (C.A. 2, 1972).

Since the transaction then does not fall within the reorganization provisions, which are designed to· cover the instances of the continuation of an existing business through a liquidation coupled with an intercorporate transfer, it follows under the teachings of prior case law that the transaction must, perhaps by definition of terms, be treated as a liquidation.

For years respondent, when faced with a liquidation-reincorporation transaction, had sought to extract an ordinary income tax on the distribution either by calling the transaction a

---

[1] Respondent does not suggest that sec. 355 is applicable, presumably because of the requirements contained in subsec. (b)(1) thereof.

[2] See S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 263-264, 265, 266 (1954).

reorganization with boot or a naked distribution taxable under section 301 or 302. Insofar as I am aware respondent has only prevailed when this or any court has found a reorganization accompanied by a nonqualifying distribution taxable as boot.[3] When a court has not found a reorganization, respondent has inevitably lost with the distribution deemed to be made in exchange for stock. Never has the respondent prevailed on the section 301-302 argument.

Now for the first time, if the logic of the majority's holding is extended, the respondent will win his point. "How sweet it will be" and who could have expected it when the respondent was simply trying to forestall the applicability of section 337 by invoking the reorganization provisions. The majority's holding is rather gratuitous, to say the least.

The majority seeks to make its decision at the corporate level more palatable by suggesting that consistency is not required between the transaction's treatment at the corporate level and at the shareholder level,[4] implying that a section 337 liquidation must be more "complete" than a section 331 liquidation. This novel suggestion finds no support in any decisional law and in fact flies in the face of the discussion of these sections in such cases as *Commissioner v. Berghash, supra,* and *Breech v. United States,* 439 F. 2d 409 (C.A. 9, 1971). In my judgment the majority is simply playing with words in order to reach what is, I suspect, a preconceived desired result. An unfortunate byproduct of this form of rationalization is the creation of uncertainty where none had existed and, if there is one thing our income tax laws do *not* need, it is more uncertainty.

The majority seems preoccupied with a continuity of shareholder interest approach. The minimal (less than 15 percent) continuity of assets is ignored. Even the House version of section 357 of the 1954 Code required, among other things, a 50-percent continuity of assets before ignoring a purported liquidation. The opinion leaves up in the air what magic percentage combination of shareholder and asset transfer will, in the future, invalidate an asserted liquidation.

---

[3] The majority did not mention that this was the finding of the courts in the decisions it cites on pp. 437–438 in support of its conclusion.

[4] Yet see the discussion in *Madison Square Garden Corp. v. Commissioner,* 500 F. 2d 611 (C.A. 2, 1974), on the question of consistency.

In this fully stipulated case I note that there is no evidence that there was, or was not, a business purpose to the transaction in issue. Of course, it is well established that the existence of a business purpose is irrelevant to the determination of whether a complete liquidation took place. *United States v. Cumberland Public Service Co.,* 338 U.S. 451, 455 (1950).

Finally, the majority relies heavily on certain dicta [5] in *Pridemark, Inc. v. Commissioner,* 345 F. 2d 35 (C.A. 4, 1965). This reliance is rather odd since the fact of the matter is that the final holding of that court was that a liquidation had in fact taken place. I must also note that in *Pridemark,* as in the instant case, the controlling shareholders remained the same and that, also in both cases, minimal assets were "reincorporated." It may well be argued that the majority has misconstrued its authority.

For the foregoing reasons I would stick with existing law and find for petitioner.

DAWSON and DRENNEN, *JJ.,* agree with this dissent.

---

[5] Dicta, incidentally, which has apparently been rejected by the Courts of Appeals for three circuits. *Commissioner v. Berghash,* 361 F. 2d 257 (C.A. 2, 1966), *Breech v. Commissioner,* 439 F. 2d 409 (C.A. 9, 1971), *Genecov v. United States,* 412 F. 2d 556 (C.A. 5, 1969).

An examination of the record in the *Pridemark* case reveals, in unobjected-to requests for findings of fact by the respondent, that Pridemark continued making sales for Golden Key into October 1958 and that the agency agreement between them was not in fact terminated until Oct. 24, 1958. The very next month, November 1958, the old shareholders of Pridemark initiated a search for a new builder of homes that it could sell. Thus, the shareholders sought to remain, and were subsequently successful, in the same line of business activity virtually without a break. The Court of Appeals still found that a valid liquidation had taken place. We must note, however, that the Court of Appeals, 345 F. 2d at 41, found that the principal shareholders stopped selling homes "for over one year," but I respectfully submit that this factual holding is in error.