**GENERAL HOUSEWARES CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**William D. SELLERS, Jr. and Virginia F. Sellers, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

75–G–2028–S, 75–H–0782–S.

United States District Court,
N. D. Alabama, S. D.

Aug. 31, 1977.

Order Dec. 1, 1977.

Robert B. Eubank, Sirote, Permutt, Friend, Friedman, Held & Apolinsky, Birmingham, Ala., for General Housewares.

Robert McDavid Smith and John E. Grenier, Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for William D. Sellers and Virginia Sellers; Robert B. Eubank, Sirote, Permutt, Friend, Friedman, Held & Apolinsky, Birmingham, Ala., of counsel as to Count Two.

Charles A. Perry, Asst. U. S. Atty., Birmingham, Ala., Benton Burroughs, Jr., Atty., Tax Division, Dept. of Justice, Washington, D. C., J. R. Brooks, U. S. Atty., Birmingham, Ala., Jack D. Warren, Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant.

Before GUIN, District Judge.

## MEMORANDUM OPINION

### I. *INTRODUCTION.*

These cases are civil actions against the United States for the recovery of Internal Revenue taxes claimed to have been erroneously, illegally, and wrongfully assessed and collected from the Plaintiff taxpayers, plus interest thereon. They have been consolidated for the limited purpose of resolving the two common issues of fact and law which they present. The relevant facts have been fully stipulated and were submitted with briefs for decision by this Court.

The captioned cases present two common issues of fact and law which arise as a result of (a) a sale by Olivier Company, Inc. (Olivier), a corporation, of a part of the stock it owned in U.S. Industries (USI) and (b) a subsequent exchange by Olivier of all of its assets, consisting of cash and USI stock, for all of its own outstanding stock. Olivier acquired the USI stock referred to in a valid tax-free Section 368(a)(1)(C) reorganization by exchanging its sole asset, all the outstanding stock of C. I. Whitten Transfer Company (Whitten), for such USI stock. During the period in which the sale and the exchange occurred, Plantation Patterns, Inc. (Plantation Patterns), and plain-

tiff William D. Sellers, Jr. (Sellers), owned all the outstanding stock of Olivier. Plantation Patterns owned two-thirds of the stock and Sellers owned one-third. Plaintiff General Housewares Corporation (General Housewares) is the successor by merger of Plantation Patterns. General Housewares instituted its action herein as successor in interest to Plantation Patterns and it and Sellers are collectively referred to as "taxpayers" herein.[1]

## II. RELEVANT FACTS.

On November 4, 1968, USI and Olivier executed an Agreement and Plan of Reorganization which provided for the exchange of all of the Whitten stock (owned by Olivier) for a specified number of shares of the USI stock. The Agreement contained a promise from USI to issue additional shares of stock to Olivier in amounts depending upon the future earnings of Whitten.

On February 5, 1969, Olivier exchanged all of its stock of Whitten, which constituted all of its assets, for stock of USI pursuant to a valid tax-free § 368(a)(1)(C) reorganization. Olivier received 113,573 shares of USI stock in the exchange which amounted to 0.89 percent of the total USI stock outstanding at the date of the transaction. On April 30, 1969, also pursuant to the plan of reorganization, Olivier received an additional 28,741 shares of USI stock which raised its percentage ownership in USI to 0.96 percent.

On November 1, 1968, Olivier had adopted a Plan of Complete Liquidation and Dissolution. In February 1969, Olivier sold 25,500 shares of USI stock for $793,884.56. In May 1969, it sold another 8,500 shares for $244,891.94. These sales were made to unrelated third parties. The total gain realized on these sales was $691,330.50. Out of the proceeds of the sales, Olivier made payments to its creditors in preparation for its liquidation.

On or about August 30, 1969, Olivier distributed all of its assets, subject to its liabilities (none). These assets consisted of cash and USI stock, and were distributed as follows to taxpayers:

| STOCKHOLDER | CASH | STOCK | VALUE OF STOCK | DISTRIBUTION |
|---|---|---|---|---|
| Wm. D. Sellers, Jr. | $32,667.76 | 36,105 | $368,964.82 | $401,636.33 |
| Plantation Patterns, Inc. | $65,336.50 | 72,209 | $737,940.71 | $803,272.66 |

As a result of the liquidation of Olivier, Sellers owned 0.20 percent and Plantation Patterns owned 0.40 percent of the USI stock outstanding.

## III. CONTENTIONS OF THE PARTIES AND ISSUES.

For the taxable year beginning February 5, 1969, and ending August 30, 1969, Olivier filed its final tax return, and took the position that the gain from the sales of USI stock in February and May, 1969, was nontaxable pursuant to Section 337 of the Internal Revenue Code of 1954 (Code). The Internal Revenue Service disagreed. The first issue is, therefore, whether Section 337 of the Code prevents the recognition of gain realized by Olivier on its sale of USI stock to unrelated third parties.

If this Court rules that Section 337 is applicable, the Defendant raises alternatively the second issue of whether any provision of the Internal Revenue Code of 1954 authorizes nonrecognition of the gain realized (except to the extent of cash received) by the taxpayers upon the distribution to them of all the assets of Olivier in exchange for all their stock in Olivier. The Defendant would apply a favorable ruling under

1. The transferees of income tax liability of Olivier for the sales of USI Stock described hereinabove are Sellers and Plantation Patterns, by reason of their being Olivier's distributees upon its liquidation. General Housewares is successor in interest to Plantation Patterns by merger of Plantation Patterns into General Housewares, and any cause of action for the refund of taxes which Plantation Patterns was entitled to pursue is now the property of General Housewares.

this second issue as an offset against an unfavorable ruling under the first issue.

IV. *ANALYSIS OF THE APPLICABILITY OF SECTION 337 WITH REGARD TO THE CODE, LEGISLATIVE INTENT, AND EXISTING CASE LAW.*

The first issue is whether Section 337 of the Code prevents the recognition of gain realized by Olivier on its sales of USI stock to unrelated third parties. Section 337(a) of the Code provides as follows:

(a) General Rule.—If—

(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

(2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

On the surface, Olivier meets the literal requirements of the statute. It adopted a Plan of Complete Liquidation on November 1, 1968 and distributed all its assets in complete liquidation on or about August 30, 1969 which is well within the twelve months allowed by the statute. The Defendant contends, however, that the statute is not applicable since the Plan of Liquidation was also a part of a plan of reorganization. Defendant argues that a "reorganization" and a "complete liquidation" are "incompatible" and, therefore, there was not a "complete liquidation" within the meaning of Section 337. As support for its position, Defendant cites a recent Court of Claims decision which is apparently the only court decision on the issue, *FEC Liquidating Corp. v. United States*, 548 F.2d 924 (Ct.Cl. 1977).

In *FEC Liquidating Corp.*, the plaintiff's predecessor, Fanon Electronics Industries, Inc. (hereinafter referred to as "plaintiff"), executed an Acquisition Agreement and Plan of Reorganization with Whittaker Corporation (Whittaker) under which plaintiff agreed to transfer substantially all of its assets to a Whittaker subsidiary in exchange for Whittaker common stock and Whittaker's assumption of certain liabilities. The transaction qualified for tax-free treatment under Sections 361 and 368(a)(1)(C) of the Code. Plaintiff also adopted a Plan of Complete Liquidation and, within twelve months from the adoption of said plan, sold a portion of the Whittaker stock to pay certain creditors and purchase outstanding warrants against its stock. The plaintiff recognized a gain on the sale and paid the appropriate tax but later made a claim for refund and bought suit for recovery of the tax paid claiming it was entitled to nonrecognition treatment under Section 337 of the Code.

The Court of Claims rejected the plaintiff's claim and held that Section 337 was inapplicable on the ground that a liquidation and a reorganization are "conceptually incompatible". The court based this conclusion on its understanding of an "unstated premise" in two of its own cases, and the "either liquidation or reorganization" nature of the inquiry of several courts dealing with the liquidation-reincorporation device.

From the *FEC Liquidating Corp.* opinion, the Defendant in this case draws the conclusion that the liquidation provisions and the reorganization provisions are "mutually exclusive". It argues that since the reorganization provisions require the taxpayers to maintain a "continuity of interest" in the transferred business, there cannot be a "complete liquidation" of a corporation participating in the reorganization.

■ This Court finds unpersuasive the defendants' contentions and the Court of Claims opinion in *FEC Liquidating Corp.* and holds that Section 337 of the Code prevents the recognition of the gain realized by Olivier on its sale of USI stock to unrelated third parties. Because of the novelty and importance of this issue, a thorough analysis of all pertinent authority having a bearing on the issue is necessary.

The Internal Revenue Code does not define the term "complete liquidation". The only regulatory provision directed to this issue is as follows:

A status of liquidation exists when the corporation ceases to be a going concern and its activities are merely for the purpose of winding up its affairs, paying its debts, and distributing any remaining balance to its shareholders. A liquidation may be completed prior to the actual dissolution of the liquidating corporation. However, legal dissolution of the corporation is not required. Nor will the mere retention of a nominal amount of assets for the sole purpose of preserving the corporation's legal existence disqualify the transaction. Regs. § 1.332–2(c).

The stipulation of facts entered into by the parties to this case clearly presents a "status of liquidation" as defined in Regs. § 1.332–2(c) as to Olivier. Olivier adopted a Plan of Complete Liquidation and Dissolution, paid its debts, and distributed the remaining balance to its shareholders.

The House of Representatives version of the 1954 Internal Revenue Code defined the term "complete liquidation" but the definition was not included in the version of the Code which eventually became law. Even though the provision was not adopted, it is instructive to note that the Congress was aware that different tax consequences may result from a "complete liquidation" but that "the circumstances under which a complete liquidation will be considered to have taken place are generally similar". The House Report stated as follows:

Subsection (b) defines a distribution in complete liquidation. This subsection is derived in part from § 115(c) of the 1939 Code, and also relates to § 112(b)(6) and 112(b)(7) of such code. Thus, subsection (b) is applicable to all distributions in complete liquidation. *Although the treatment of distributions in liquidation (under Part II) differs from that provided in any specific situation under existing law, the circumstances under which a complete liquidation will be considered to have taken place are generally similar.* Thus, under your Committee's bill, a complete liquidation requires the distribution of substantially all of the corporate assets. Accordingly, under the definition in § 336(b), a corporation will be deemed to have completely liquidated even though the business previously carried on by it is continued in partnership or sole proprietorship or other noncorporate form. 3 U.S.Code Cong. & Admin.News 1954, p. 4250 (emphasis added).

The only instance in which the Congress appeared concerned over the potential for abuse of the liquidation provisions was where a liquidation is followed by a reincorporation of the business assets by the same shareholders. By using this series of transactions, excess earnings and profits or unwanted assets of a corporation can be bailed out at favorable capital gains rates. Even when faced with this potential problem, however, the Congress determined that the problem was "not sufficiently serious to require a special statutory provision". *Id.* at 5301. The response of Congress to this problem was simply as follows:

It is believed that this possibility can appropriately be disposed of by judicial decision or by regulation within the framework of the other provisions of the bill. *Id.*

Thus, it is apparent from the legislative history that Congress, when enacting the liquidation provisions, was under the assumption that the term "complete liquidation" would take on its normal meaning, *i. e.*, the distribution of substantially all of the corporate assets and dissolution of the corporate shell, unless the device known as a "liquidation-reincorporation" was attempted by a taxpayer.[2] The Regulation quoted

**2.** The basic fact pattern of the Section 337 version of the "liquidation-reincorporation" device is where a closely-held corporation sells its *operating* assets to a corporation owned by its own shareholders in a tax-free Section 337 transaction, taking cash or notes in payment, and then distributes the cash, notes, or other liquid assets to its shareholders in exchange for their stock. The most common objective of such a device is to distribute to shareholders surplus earnings and profits to shareholders which would normally be termed a dividend and taxed at ordinary income rates and treat it as a liquidating distribution which under certain sections may be taxed as a capital gain. If this result is accomplished, substantial tax may

earlier indicates that the drafters of the Regulations were under a similar assumption.

In keeping with the tenor of the committee reports, the courts, until the Court of Claims decision in *FEC Liquidating Corporation v. United States, supra,* have questioned whether a corporation has "completely liquidated" *only* in those instances where the operating assets of a business have been reincorporated under substantially the same ownership. In all cases in which liquidation treatment, either at the corporate level or at the shareholder level, has been denied, the shareholders of the liquidating corporation have owned at least eighty percent of the stock of the new corporation which contains the operating assets of the liquidating corporation.[3] Where such a device is attempted it is apparent that the "complete liquidation" of the original corporation is really a sham. The same operating assets are still being controlled by the same shareholders. Only the name of the corporation has been changed with a simultaneous bailing out of unwanted surplus assets.

In working within "the framework of the other provisions of the bill," the courts and the Internal Revenue Service have devised several approaches to defeat the device. The most widely used approach is to recharacterize the various transactions as a "reorganization." See, *e. g., Werner Abegg,* 50 T.C. 145 (1968), *Ralph C. Wilson,* 46 T.C. 334 (1966), *James Armour, Inc.,* 43 T.C. 295 (1964) ("D" Reorganization), and *Davant v. Commissioner,* 366 F.2d 874 (5th Cir. 1966) ("E" and "F" Reorganizations). By branding the series of transactions as a reorganization, the distribution from the liquidating corporation is taxable as a dividend to the shareholders. The drawback to this approach is that the dividend is limited to a ratable share of the undistributed earnings and profits of the corporation, and to the amount of gain realized by the shareholder. I.R.C. § 356. Because of this drawback, the Service has tried to recharacterize the transaction as a dividend under Section 301. Rev.Rul. 61–156, 1961–2 C.B. 62. See also, Regs. §§ 1.301–1(1), 1.331–1(c). Thus far, only the Fifth Circuit has accepted this approach. See *Davant v. Commissioner, supra.*

One other approach recently adopted by the Tax Court is to say that a "complete liquidation" has not occurred. *Telephone Answering Service Company,* 63 T.C. 423 (1974), aff'd without published opinion, 39 A.F.T.R.2d 786 (C.A. 4, Nov. 8, 1976), cert. denied, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed. 2d 224 (1977). The gist of all these cases is basically that the transaction is really not a liquidation but rather it is something else that produces the desired tax effect.

A review of several cases will further support and delineate the general rules outlined above.

The first court to really discuss the term "complete liquidation" in the liquidation-reincorporation context was the Fourth Circuit in *Pridemark, Inc. v. Commissioner,* 345 F.2d 35 (4th Cir. 1965). In that case, the taxpayer, Pridemark (two corporations in different states with the same name which were treated as one for discussion purposes), adopted a plan of liquidation and sold a substantial amount of its operating assets to its supplier. The taxpayer and the supplier were having disputes over the conduct of the business which precipitated the liquidation. Within one year from the sale of the assets, a new supplier approached the old shareholders and, as a result, a new corporation was formed, with the same

---

be *avoided.* Other evil purposes may motivate taxpayers to utilize this device, but the single purpose described above will suffice for purpose of discussion here.

**3.** Boris Bittker and James S. Eustice in their much cited work entitled *Federal Income Taxation of Corporations and Shareholders,* 3rd ed. (1971) reveal their findings as follows:

In almost all of the reincorporation cases which the Government has won to date, shareholders of the old corporation have maintained proprietary continuity of one hundred percent in the *acquiring* corporation, and the Service has not won a reincorporation case where shareholder continuity in the *acquiring* corporation dropped below eighty percent. *Id.* at pp. 14 128. (emphasis added)

name, to conduct the same business with the new supplier. Since ninety-one percent of the shares in the new corporation were owned by the same shareholders of the old corporation, the resolution of the case turned upon whether there was a proper cessation of business to amount to a "complete liquidation". Under these facts the Court concluded that "If the liquidated business is not resumed by the new corporation as a continuation of a going concern, there is a 'complete liquidation'". 345 F.2d at 41.

The distinction between the facts in *Pridemark, Inc.* and the typical "liquidation-reincorporation" cases discussed above is obvious. A substantial portion of the operating assets of the old corporation were sold to the old supplier. The new corporation was basically starting from scratch. Thus, *Pridemark* stands for the proposition that even though substantially the same shareholders in the liquidating corporation form a new corporation to operate the same type of business, if a substantial portion of the old corporation's operating assets are disposed of, a "complete liquidation" will be found to exist.

The next court to discuss the term "complete liquidation" was the Fifth Circuit in *Davant v. Commissioner*, 366 F.2d 874 (5th Cir. 1966). In that case, two corporations, termed "Warehouse" and "Water" for discussion purposes, were owned identically by the same shareholders. They desired to reduce the earnings and profits of each corporation without incurring any ordinary income at the shareholder level. In order to accomplish this, they concocted a scheme under which the Warehouse shareholders sold their stock to a "straw man" who then had the corporation sell its operating assets

to Water and liquidate. The result of all of this was that the original Warehouse shareholders still controlled all of Warehouse's operating assets through their control of Water, and they received $914,200 which was taxed at favorable capital gains rates. Thus, in substance, the same operating assets were being controlled by the same shareholders under simply a different corporate name. Once again, it is understandable to see how the court would conclude that "Clearly, this liquidation cannot come within the intention of Congress in enacting the complete liquidation provisions". 366 F.2d at 882. The court summarized its reasoning as follows:

> Petitioners never intended to give up the corporate form of doing business. At all times relevant their intention was to transfer Warehouse's operating assets to Water. Water and Warehouse were owned by identical shareholders with identical distribution of shares. At no time did the petitioners' interest in the operating assets change. Most of the reported cases involve situations where the stockholders create a new corporate shell to receive the assets, but we see no difference between a liquidation followed by a transfer to a new corporate shell and a liquidation followed by a transfer to an already existing corporate shell. *Id.* at 883.

The court went on to hold that the $914,200 received by the Warehouse shareholders was a dividend, but stated that any one of three different approaches could be utilized to reach this result.[4] The conclusion to be drawn from this analysis is that court opinions to the effect that the series of transactions is "either a liquidation or a reorganization" should be confined to those instanc-

---

4. The court first stated that the sales proceeds received by the shareholders were in reality dividends under Section 301 declared incident to a reorganization.

The second approach offered by the court to achieve dividend treatment for the shareholders was to apply Section 356 to the shareholders. This provision is designed to delineate the tax effect to the shareholders who receive property from a corporation which participates in a tax-free reorganization. This is the ap-

proach adopted by many of the courts dealing with the "liquidation-reincorporation" device discussed above wherein a reorganization under Section 368(a)(1)(D) was found to have occurred.

The third alternative offered by the court was to treat the transaction as a change in form under Section 368(a)(1)(F) which causes the amounts received by the shareholders to be tested under the standards laid down under Sections 301 and 316.

es where the court was searching for an effective approach to deal with the "liquidation-reincorporation" device, *i. e.*, the distribution of cash or other liquid assets to shareholders who retain control over the operating assets under a different corporate name. Such statements should *not* be construed to apply to transactions which are clearly not within the "liquidation-reincorporation" problem.

The Defendant in this case has sought support for its position by relying on several cases which present a slight but insubstantial variation in the basic liquidation-re-incorporation transaction described above. As noted in footnote 2 herein, the basic device is executed by a sale of the operating assets to a corporation owned by the same shareholders and a liquidation of the old corporation which then passes cash and other liquid assets to the shareholders in exchange for their old stock. In several cases wherein this basic approach was adopted, certain *unwanted* assets or an *insignificant* amount of operating assets were sold to some third party not involved in the device. In collapsing the entire device, the courts have correctly held that Section 337 should not apply to the sales to outsiders as well as the sales to the new corporation. Since basically the same operating assets are being controlled by the same shareholders, it is clear that a "complete liquidation" really did not occur. Thus, all distributions to the shareholders should be treated as a dividend and no effect should be given to the use of Section 337 for sales at the corporate level. In effect, the corporation simply sold some of its unwanted assets or an insignificant amount of its operating assets to an outsider and said sale should be taxed under the normal provisions. A review of the cases cited by the Defendant in its trial brief will support this analysis.

In *Abegg v. Commissioner*, 50 T.C. 145 (1968), aff'd. 429 F.2d 1209 (2d Cir. 1970), cert. denied sub nom. *Cresta Corp., S.A. v. Commissioner*, 400 U.S. 1008, 91 S.Ct. 566, 27 L.Ed.2d 621 (1971), Hevaloid Corporation adopted a plan of complete liquidation and sold certain stocks to third parties. The corporation was being operated by the tax-payer, Abegg, as a personal holding company. As sole shareholder, the taxpayer received the remaining assets and sales proceeds and immediately transferred them to another corporation called Cresta Corporation, S.A. The taxpayer owned all the stock of Cresta Corporation, S.A., also. No gain on the sale of stock was reported by Hevaloid Corporation which relied on Section 337. The Tax Court's holding that Section 337 was not applicable under these circumstances was affirmed by the Second Circuit.

This ruling is clearly consistent with the other cases reviewed hereinabove. There was basically no change in the assets held by the corporation and the ownership of the corporation. In effect, the transaction was simply a sale of certain shares of stock by the corporation. The name given to the corporation really had no significant meaning. Certainly the court was justified in not allowing the corporation to avoid tax in this situation.

In *Wilson v. Commissioner*, 46 T.C. 334 (1966) a father and son each owned fifty percent of the stock of two corporations termed "A" Company and "B" Company by the court. A Company adopted a plan of complete liquidation and transferred its operating assets to B Company in exchange for cash. It also sold a portion of some stock *purchased for investment* to a third party. A Company then distributed its assets which consisted of cash and the remaining investment stock to the taxpayers (the father and son) in liquidation of the company.

Once again, the Tax Court was correct in holding that Section 337 should not apply. The same operating assets were being controlled by the same shareholders. The effect of the transaction was simply a sale by the corporation of a portion of some stock purchased for investment and distribution of the proceeds and other liquid assets to the shareholders.

In *Telephone Answering Service Co. v. Commissioner, supra*, the taxpayer-corporation (T.A.S.C.O.) desired to sell the stock of

one of its subsidiaries with no gain at the corporate level. To effectuate this wish, a scheme was devised which involved some sophisticated corporate razzle dazzle. In simplified form, T.A.S.C.O. formed a new subsidiary called New T.A.S.C.O. and then adopted a "Plan of Complete Liquidation and Dissolution". Following the adoption of the Plan it engaged in the following transactions: (1) sold the subsidiary stock reporting no gain under Section 337; (2) transferred its operating assets to New T.A.S.C.O. in return for more New T.A.S.C.O. stock; and (3) distributed pro rata among its shareholders the cash it received from the sale of the subsidiary stock plus the new T.A.S.C.O. stock and the stock of another subsidiary.

The result of these transactions was that no gain was recognized at the corporate level on the sale of the subsidiary stock and yet the operation of the business went on as usual. The court summarizes the continuation of the operating business as follows:

On April 28, 1967, 1 or 2 days after the Articles of Dissolution of T.A.S.C.O. were filed with the State of Maryland, New T.A.S.C.O., which had been operating under the name of Telephone and Radio Answering Service Co., Inc., changed its name to Telephone Answering Service Co., the same named used by T.A.S.C.O.

. . . Upon the transfer of T.A.S.C.O.'s assets to New T.A.S.C.O., New T.A.S.C.O. took over the telephone-answering service operations which were previously operated by T.A.S.C.O. The customers were never notified that they were being serviced by a different organization.

New T.A.S.C.O.'s offices were identical with those which had previously been used by T.A.S.C.O. Since New T.A.S.C.O.'s address and telephone numbers were identical with those used by T.A.S.C.O., New T.A.S.C.O. continued to use the stationery which had formerly been used by T.A.S.C.O. The forms used by New T.A.S.C.O. to communicate with customers were identical to those previously used by T.A.S.C.O. No effort was made by New T.A.S.C.O. to alter any of the procedures for dealing with the customers.

New T.A.S.C.O. did obtain a new employee identification number and did secure new bank accounts; however, the bank accounts were maintained in the same lending institutions and, although the unemployment insurance account number was new, the experience rating of New T.A.S.C.O. was identical with that formerly given T.A.S.C.O. With the exception of Houser, all of the persons employed by New T.A.S.C.O. were identical with those who had been employed by T.A.S.C.O.

The shareholders of New T.A.S.C.O., who numbered approximately 40 to 50, were, with the exceptions enumerated below, identical, both in number, name, and percentage of ownership with those who were the shareholders of T.A.S.C.O. from approximately mid-year 1962 until it filed Articles of Dissolution in April, 1967. The only significant difference in the ownership of New T.A.S.C.O., as compared with that of T.A.S.C.O., was that Houser, the owner of 15.7 percent of the T.A.S.C.O. stock and 15.7 percent of the New T.A.S.C.O. stock, immediately upon New T.A.S.C.O.'s acquisition of T.A.S.C.O.'s assets, transferred his New T.A.S.C.O. stock to North American in an exchange previously described. Therefore, Houser was a shareholder of New T.A.S.C.O. for a minimal period of time. There were, however, some minor reacquisitions of stock by New T.A.S.C.O. The reacquired New T.A.S.C.O. stock was held by nine people and amounted to less than 5 percent of the total stock outstanding. . . . 63 T.C. at 428, 429.

The court's response to this series of transactions was as follows:

Clearly, the transactions under consideration herein did not meet the foregoing standards [for a "complete liquidation"]. The businesses which petitioner directly operated were continued without interruption by New T.A.S.C.O., with substantial continuity of shareholder interests. The only result of the transaction was to place the North American stock [the sub-

sidiary stock which was not sold] and a sizable amount of cash in the shareholders' hands. New T.A.S.C.O. was merely the alter ego of petitioner with respect to all of its directly owned business assets; its formation and utilization served no purpose other than masking a distribution as one in complete liquidation. . .
To hold for the petitioner in the instant case would frustrate the congressional purpose to deny Section 337 treatment in connection with distributions of ongoing corporations. We cannot give tax effect to the *"mere shifting of charters"*, *Helvering v. Elkhorn Coal Co.*, 95 F.2d 732, 734 (C.A. 4, 1938), masquerading as a complete liquidation. *Id.* at 435 (emphasis added)

The basic holding of the court is that a "complete liquidation" for the purposes of Section 337 will not have occurred if immediately following the transaction substantially the same business is being operated in corporate form under the ownership of substantially the same shareholders. A corporation should not be allowed to avoid gain on the sale of some of its assets by going through the fiction of liquidating and then reincorporating the same business with the same assets and shareholders. The *T.A.S.C.O.* case is significant because it is the latest word on the meaning of the term "complete liquidation". For that reason, it is imperative that the rationale of the court be analyzed in detail.

After stating the holding described above, the court crystallized its reasoning by distinguishing two cases, *Berghash*, 43 T.C. 743, aff'd *Commissioner of Internal Revenue v. Berghash*, 361 F.2d 257 (2d Cir. 1966), and *Breech v. U. S.*, 439 F.2d 409 (9th Cir. 1971). In *Berghash*, a corporation liquidated under Section 337 and sold its operating assets to a new corporation in return for fifty percent of the new corporation's stock, which was then distributed to the owner of the liquidating corporation. The other fifty percent shareholder in the new corporation was an employee but not a shareholder of the liquidating corporation. The new corporation continued to operate the same business, under the same name,

and in the same location as the liquidating corporation. In spite of this, the Tax Court held that there was a "complete liquidation", stating as follows:

In the absence of a non-taxable reorganization under Section 368(a)(1), it is the respondent's final contention that for the purposes of determining the applicability of Section 337 of the Code, there was no complete liquidation of the predecessor corporation within the meaning thereof. He contends that this is so because of the fact that the successor corporation continued to operate exactly the same drug store, under the same name, and in the same location as previously had been conducted by the old corporation. The respondent claims without the citation of any authority, that Section 337 can apply only when a bona fide termination of the business of the liquidating corporation has occurred.

The parties have stipulated that "Between January 29, 1957 and May 5, 1957, Delavan-Bailey distributed all of its remaining assets to Berghash in complete liquidation". The stipulation of facts further states that Delavan-Bailey was dissolved by the filing of a Certificate of Dissolution with the Secretary of State of New York, on April 23, 1957. There is therefore no question whatever but that as a matter of fact the old corporation was completely liquidated.

We are unable to find any authority or any indication from the legislative history of Section 337 that would require us to disregard the actual liquidation and dissolution of Delavan-Bailey. . . . 43 T.C. at 758, 759.

The court distinguished *Pridemark, Inc.* as follows:

In the instant case there occurred a drastic shift in the proprietary interest of the owner of the predecessor corporation. Hyman Berghash, who had owned all of the stock (except the two shares owned by his wife) of the old Delavan-Bailey Drug Co., Inc. wound up as the owner of only fifty percent of the stock of the

successor corporation. The situation before us, therefore, is distinguishable from *Pridemark, Inc., supra,* on a crucial point. Despite the fact that all of the operating assets were carried over to the successor corporation, which continued exactly the same business, in the same location, as had been conducted by the predecessor, the radical shift in stock ownership which occurred precludes us from holding that the transaction amounted to no more than "a mere change in identity, form, or place of organization" within the meaning of Section 368(a)(1)(F). *Cushman Motor Works v. Commissioner,* [130 F.2d 977 (8th Cir.)] *supra ; Joseph C. Gallagher,* [39 T.C. 144] *supra,* Id. at 754.

The Tax Court in *Berghash,* therefore, adds another significant criterion to the determination of whether a "complete liquidation" has occurred. The court felt that the significant shift in control over the assets was a "crucial point" not addressed by the Fourth Circuit in *Pridemark, Inc.*

The Second Circuit Court of Appeals expanded upon the Tax Court's opinion as follows:

The only point upon which we see any need to expand upon the Tax Court's decision is the Commissioner's argument that, if the business of the liquidated corporation is continued by the new corporation, there is no "complete liquidation" within the meaning of Sections 331 and 337. This argument, apparently derived from an earlier report of the Senate Finance Committee . . . and from Treas.Regs. § 1–332–2(c) (1955) has been accepted in a dictum by the Fourth Circuit in a decision subsequent to the Tax Court's decision in the instant case. *Pridemark, Inc. v. Commissioner,* 345 F.2d 35, 41 (4 Cir. 1965). We are in complete agreement with the Tax Court's resolution of this issue; its interpretation reflects the normal meaning of the words "complete liquidation" in Sections 331 and 337. To adopt the Commissioner's contention would do violence to the plain meaning of these statutes. It is inconceivable that the Berg-

hashes would intentionally have reincorporated a corporation with a net worth of $124,000 if this would require them to pay income taxes of approximately $100,-000, as the Commissioner here asserts are owing. We can only conclude that the Tax Court's result is consistent with the intent of Congress, which considered the reincorporation problem in 1954 but rejected specific proposals for dealing with it as the Commissioner suggests. 361 F.2d at 260.

The essence of the combined opinions of these two courts is that where the liquidation-reincorporation device is not being attempted, the courts should look only to the "normal meaning of the words 'complete liquidation' in Sections 331 and 337". The fact that the shareholder of the liquidated corporation only controlled fifty percent of the stock of the new corporation was deemed a significant factor in concluding that the liquidation-reincorporation device was not at issue in the case even though the same business was continued in corporate form.

The Fifth Circuit endorsed this distinction in *Genecov v. United States,* 412 F.2d 556 (5th Cir. 1969). The court stated as follows:

In addition, there may be a complete liquidation even if the business of the liquidating corporation is continued by the new corporation. *Commissioner of Internal Revenue v. Berghash,* 2 Cir., 1966, 361 F.2d 257, 412 F.2d at 562.

The Ninth Circuit adopted the *Berghash* analysis in *Breech v. U. S., supra.* In that case, a corporation adopted a plan of complete liquidation and transferred its operating assets to a newly formed corporation in return for twenty percent of its stock. The old corporation then liquidated, distributing the new corporation's stock pro rata to its shareholders. The remaining shares of the new corporation were purchased by a corporation approximately seventy-five percent of which was owned by the shareholders of the old liquidating corporation. Thus, the shareholders of the liquidating corporation owned twenty percent of the new corpora-

tion directly and one hundred percent indirectly. In spite of this, the Ninth Circuit held that a "complete liquidation" occurred under Section 337. The court stated its holding as follows:

The Government makes three arguments on appeal, two of which may be treated quickly. First, it argues that the liquidation of Valley-1 cannot qualify as a "complete liquidation" within the meaning of sections 331 and 337 because the assets of Valley remained in corporate solution under the effective control of the same taxpayers who controlled Valley-1, even though Valley-1 was completely dissolved under California law, citing dicta from three circuits. See Babcock v. Phillips (10th Cir. 1967) 372 F.2d 240, 243 cert. denied, 387 U.S. 918, 87 S.Ct. 2030, 18 L.Ed.2d 970; Davant v. Commissioner of Internal Revenue (5th Cir. 1966) 366 F.2d 874, 882–883; Pridemark, Inc. v. Commissioner of Internal Revenue (4th Cir. 1965) 345 F.2d 35, 41. We reject the dicta, and we adopt the holding of the Second Circuit with its rationale that neither the language of sections 331 and 337 nor the legislative history of those sections sustains the Commissioner's interpretation, so long as the taxpayers' action is supported by a valid business purpose. (Commissioner of Internal Revenue v. Berghash (2d Cir. 1966) 361 F.2d 257; See, Gallagher v. Commissioner of Internal Revenue (1962) 39 T.C. 144.) 439 F.2d at 410.

The "business purpose" for the liquidation was that the taxpayers wished to reinvigorate a faltering car dealership by placing the assets in the control of another corporation which had a capital situation far superior to that of the liquidating corporation and had more talented personnel available to run the business.

The significance of the fact that the shareholders of the old corporation owned only twenty percent of the stock of the new corporation outright was brought out later in the opinion when the court rejected the Government's argument that the transaction really amounted to a reorganization under Section 368(a)(1)(D). Thus, even though the court stressed the "valid business purpose" in its holding that a "complete liquidation" occurred, the basic fact pattern in this case falls within the outline discussed above. Since the new corporation was not merely the alter ego of the old corporation, possessing the same operating assets with the same stock ownership, a "complete liquidation" was found to exist.

After a thorough analysis of the applicable cases, the opinions begin to take on a remarkable consistency. The courts are basically dedicated to carrying out the Congressional directive that they must combat the "liquidation-reincorporation" device by using the established statutory framework. Whenever a situation occurs in which a taxpayer desires to retain a business in corporate solution maintaining the same control over the assets through stock ownership while engaging in a transaction that would normally result in tax, the courts have used a number of tools to give the proper effect to the transaction. Some courts have called the transaction a reorganization so that the shareholders must determine their tax consequences under Section 356. Other courts have simply held that a "complete liquidation" did not occur so that the normal tax provisions would apply. The Tax Court in T.A.S.C.O. summarized all of this nicely when it stated, "We cannot give tax effect to the 'mere shifting of charters'." 63 T.C. at 435. The fact pattern in those cases has been distinguished from the situation in which the operating assets did not wind up in the new corporation (Pridemark, Inc.) and the situation in which the shareholders of the old corporation do not own substantially all of the stock of the new corporation (Berghash and Breech).

The question for this court is whether a "mere shifting of charters" occurred in this case. The assets of Olivier were transferred to U.S.I. for an amount of U.S.I. stock which (after one adjustment) represented 0.96 percent ownership in the corporation. Since a portion of the U.S.I. stock was sold to pay off the corporate liabilities, the Olivi-

er shareholders (Plaintiffs in this case) wound up owning only 0.60 percent of U.S.I. Thus, while the transferred assets were being held by Olivier, the taxpayers in this case had one hundred percent control over their utilization and disposition, but after their transfer the taxpayers control over these assets diminished to a miniscule 0.60 percent. Clearly, more than a mere "shifting of charters" has taken place. A complete exchange of investments has occurred. The taxpayers have exchanged their control over a small holding company possessing the Whitten stock for the stock of a large national concern. The new corporation does not even remotely resemble the old liquidated corporation. The old corporation and all of its purposes has completely ceased to exist. A holding that a complete liquidation of Olivier occurred in this case is certainly consistent, not only with the normal meaning of that term, but also with all of the cases outlined above.

The Defendant presupposes that the term "complete liquidation" means a liquidation of the *business* as it existed prior to the reorganization. In fact, the term means a liquidation of the *corporation* unless such a liquidation is a sham or a "mere shifting of charters". The intent of Congress to this effect is clear and this should be the test as to whether a "complete liquidation" has occurred.

One further distinction needs to be made to complete this analysis. The Defendant argues that the existence of the continuity of interest required for the reorganization in this case necessarily means that a "complete liquidation" for the purposes of applying Section 337 cannot have occurred. The problem with this analysis is that the term "continuity of interest" has more than one meaning. The authors Bittker and Eustice summarize the "multi-faceted character" of the term as follows:

> The continuity-of-interest doctrine has a multi-faceted character, depending upon the contexts in which it arises. At the corporate level, the major focus is on the business enterprise and its continuation, under modified forms, following the corporate readjustment . . . . ; at the investor level, the relevant factors are the nature and extent of their continued participation in the corporation's control, earnings and assets, and the relationship of their interests to those of other shareholders as security holders after the transaction has been consummated. Thus, the nature of the consideration received in the transaction (stock, debt, or other property), the remoteness of the ownership interests from the underlying assets of the business, the proportion of old owners who continue their participation after the transaction, the length of time the investor interests continue (holding aspects), and the special features and problems of "debt security" all form important aspects of the continuity-of-interest concept. Bittker and Eustice at pp. 14–16.

The authors then go on to trace the continuity-of-interest doctrine as it relates to the reorganization provisions. They begin their discussion as follows:

> The continuity-of-interest doctrine, set out in Regs. § 1.368–1(b) and (c), can be traced back to *Cortland Specialty Co. v. Comm.*, 60 F.2d 937, 11 A.F.T.R. 857 (2d Cir. 1932), where substantially all the properties of one corporation were acquired by another corporation in exchange for cash and short term promissory notes. Although the transfer came within the literal language of the reorganization provisions, the court held that the term "reorganization" presupposes "a continuance of interests on the part of the transferror in the properties transferred" and that the transaction before the court was too much like a sale to satisfy this criterion. *Id.* at 14–16.

After a discussion of the various cases giving substance to the doctrine as it relates to the reorganization provisions, the authors summarized the results as follows:

> Thus, the continuity-of-interest requirement, as developed in the above decisions, seem to involve two distinct elements: (a) the qualitative nature of the consideration given by the transferee; and (b) the

proportion or amounts thereof which consisted of "continuity-preserving" interests. As to the former, the only type of consideration which carried the requisite continuity "genes" was an equity interest, evidenced by common or preferred stock, whether voting or non-voting. Cash or its equivalent (e. g., short-term purchase money notes), long-term debt security, and the assumption of liabilities all failed to meet the tests of continuity, since the transferors, by the receipt of such consideration, were either cashing in their investment interests in the property, or switching to a temporary creditor status with respect thereto, rather than retaining a proprietary interest.

As to the relative amounts of equity and non-equity consideration which could be received by the transferors, matters were less clear. The *Minnesota Tea* case [*Minnesota Tea Co. v. Commissioner of Internal Revenue*, 76 F.2d 797 (8th Cir.)] held that the equity-mix must be a "substantial" or "material" part of the value of the transferred assets, and that a fifty-six percent equity interest was adequate by this standard; *Southwest Natural Gas* [*Southwest Natural Gas Co. v. Commissioner of Internal Revenue*, 189 F.2d 332 (5th Cir.)], on the other hand, held that less than one percent was not, even though substantial pre-existing continuity was present there. It should be noted that the percentages in question represent the proportion of equity consideration to aggregate consideration received for the transferred assets, not the relation between the transferors' equity in the transferee and the total equity therein; *a whale can swallow a minnow and satisfy the continuity-of-interest requirement. Id.* at pp. 14–19. (emphasis added)

Thus, the "continuity-of-interest" doctrine as used in the reorganization provisions relates to the receipt of certain qualified property in the reorganization exchange. The consideration received by the transferor must contain a certain amount of common or preferred stock in the transferee before a reorganization will be found to exist. As noted by the authors and emphasized by the Plaintiffs in this case, the "continuity-of-interest" doctrine as utilized in the reorganization provisions does not relate to the *amount* of control retained over the assets as held in the transferee. As long as the transferor receives stock in the transferee, it does not matter that the shareholders went from one hundred percent control over the transferred assets in the hands of the transferor to one percent control over the assets in the hands of the transferee.

The distinction between the discussion of "continuity-of-interest" in this context with the discussion of that doctrine in the "liquidation-reincorporation" context is noteworthy. In every case specifically discussing the meaning of the term "complete liquidation" the owners of the liquidating corporation have owned substantially all, if not all, of the stock of the new corporation (or to state differently, the acquiring corporation or the transferee corporation). The Tax Court and Second Circuit Court of Appeals in *Berghash* and the Ninth Circuit Court of Appeals in *Breech* make it clear that in determining whether a "complete liquidation" has occurred, the focus should not be on whether the shareholders of the liquidating corporation own *any* stock in the purchasing or transferee corporation, but that those shareholders own all or substantially all of the purchasing corporation's stock. As stated hereinabove, there does not appear to be a mere "shifting of charters" where the shareholders which held one hundred percent control over assets held in corporate form now only own 0.60 percent of those assets. This is true especially where the businesses carried on by the transferor corporation and the acquiring corporation are completely different.

In this case, Olivier received only U.S.I. common stock in exchange for the transfer of its assets and therefore met the "continuity-of-interest" requirement set forth in Section 368(a)(1)(C). It met this requirement because it received stock in U.S.I. instead of cash or short term debt. The critical distinction is not, however, in the

nature of consideration received, but rather in the amount of control maintained over the assets transferred. Where, as here, the control over the transferred assets is drastically reduced and the nature of the investment changes altogether, more than a "mere shifting of charters" has occurred.

The Defendant argues that the liquidation provisions and the reorganization provisions are "mutually exclusive"; however, a review of the applicable statutory provisions reveals that "mutually co-existing" is a better description of their relationship.

If a corporation (hereinafter referred to as the "Acquiring Corporation") wishes to acquire the assets of another corporation (hereinafter referred to as the "Target Corporation"), there are several approaches it can take. One approach is to have the Acquiring Corporation transfer part of its voting stock for the Target Corporation's assets pursuant to a plan of reorganization adopted under Section 368(a)(1)(C) of the Internal Revenue Code. This is commonly referred to as a Type C reorganization. If the requirements of Section 368(a)(1)(C) are met, several special statutory provisions become applicable.

Section 361 provides that even though the assets exchanged by the Target Corporation have a fair market value greater than or less than their basis, no gain or loss is recognized if the exchange is solely for stock or securities in the Acquiring Corporation. It is important to note that this provision protects the Target Corporation from recognition of gain only on the exchange with the Acquiring Corporation. It has no application to the recognition or nonrecognition of gain or loss on a subsequent liquidation of the Target Corporation. The Target Corporation does not have to liquidate for Sections 368(a)(1)(C), 361, and 358 to apply.

The basis of the stock or securities received from the Acquiring Corporation will be the same as the basis of the assets transferred. Section 358(a)(1). This preserves the potential gain or loss on the assets held by the Target Corporation. The gain will be recognized when the Acquiring Corporation's stock is sold.

If, as part of the plan of reorganization, the Target Corporation adopts a plan of liquidation, two more provisions become applicable to the shareholders of the Target Corporation. Section 354 states that no gain or loss is immediately recognized if the stock in the Target Corporation held by the shareholders is exchanged solely for the stock of the Acquiring Corporation which, at that time, is being held by the Target Corporation. This provision is important because Section 331 treats a distribution in liquidation of a corporation as an exchange which will be taxable unless otherwise provided in the Code. See Sections 1001, 1002.

The basis of the stock received by the shareholders will be the same as the basis of the stock surrendered, so their gain is merely deferred until they sell the stock. Section 356 modifies Section 354 by providing for partial or total recognition of gain (but not loss) by the shareholders if certain unqualified property commonly referred to as "boot" is received. Thus, one side of the liquidation, the shareholder's side, is covered by a special provision relevant only when the liquidation occurs pursuant to a plan of reorganization. The other side of the liquidation, i. e., the corporation's side, is not covered by a special provision, however. Sections 354 and 356 apply only to shareholders. Section 361 covers only the exchange with the Acquiring Corporation, not the liquidation of the assets to the shareholders. The question, therefore, remains as to what provision prevents the Target Corporation from recognizing gain or loss when it liquidates.

Clearly, the applicable provision is Section 336, which provides that "no gain or loss shall be recognized to a corporation on the distribution of property in partial or complete liquidation."

To summarize, where a plan of liquidation is adopted as a part of a plan of reorganization, special provisions are applicable to the shareholders of the Target Corporation, but not the Target Corporation itself. Since no special provision is applicable, its tax consequences are necessarily governed by the usual liquidation provisions.

Since Section 336 applies, so should Section 337. Both deal specifically with the recognition of gain or loss by the liquidating corporation. It would be inconsistent to hold that the liquidation is a "complete liquidation" for the purposes of Section 336 but not for the purposes of Section 337. This holding is given further support by recent court decisions and a Revenue Ruling in another area of tax controversy.[5]

The authors Bittker and Eustice note these arguments and point out several others in their critique of the *FEC Liquidating Corp.* case when they state as follows:

*FEC Liq. Corp. v. U. S.*, 548 F.2d 924, 39 AFTR2d 709 (Ct.Cl.1977), held that the reorganization provisions completely preempt the liquidation provisions, so that the transferor-corporation in a Type "C" reorganization could not rely on § 337 for nonrecognition treatment as to sales of the transferee's stock which it had received in the reorganization exchange. Presumably, the court did not intend to hold that the transferor-corporation must recognize gain when it distributes the transferee's stock to its shareholders in complete liquidation pursuant to the plan (§ 336 clearly would seem to apply to protect the distributing corporation here, as it also would in the case of a § 355 distribution). As to the mutual exclusivity of the liquidation and reorganization provisions generally, one does not need to be a "guru" to argue that the present statutory scheme certainly does not, on its face, purport to effect this result (the coexistence of § 336 with acquisitive and divisive reorganization "liquidations" has been noted above; see also § 311(d), which does not apply to reorganization "liquidations" according to the regula-

tions, *supra* ¶ 9.64, presumably since § 311(a), or § 336, does so apply; also, application of § 311 (or § 302) at the distributee level in the § 356 "boot" context is by now relatively well settled; finally, the emerging "parity" approach for § 336 and § 337, *supra* ¶ 11.65 at page 72 of text, adds a further argument against the court's holding in the *FEC* opinion). 1977 Cumulative Supplement, No. 2, at pp. 514–23.

The reorganization provisions should take precedence where they are specifically applicable, but the liquidation provisions should continue to apply where there is no specific reorganization provision applicable, and the effect of the provisions is not mitigated thereby.

The final argument of the Defendant arises from the applicability of certain special reorganization provisions to the taxpayers as shareholders of the liquidating corporation (Olivier). As described hereinabove, when a liquidation occurs as a part of a plan of reorganization, Sections 354 and 356 specifically apply to the shareholders of the liquidating corporation. Those provisions basically provide that the gain realized by the shareholders from the liquidation shall be recognized only to the extent of any unqualified property ("boot") received. The recognition of the remaining gain is *deferred* (through the operation of the basis provision, Section 358) until the stock in the acquiring corporation is sold.

The defendant in its brief quotes from the legislative history of Section 337 and argues that there is an "implicit" requirement that any gain realized from the liquidation must be recognized immediately.[6]

This court holds that the immediate recognition of gain at the shareholder level is not an "implicit" requirement for the

---

**5.** In applying the common-law doctrines of "tax benefit" and "assignment of income" to a liquidating corporation, the courts and the Internal Revenue Service have held that there should be no distinction between Sections 336 and 337. See *Midland-Ross Corporation v. United States*, 485 F.2d 110 (6th Cir. 1973) (assignment of income); Rev.Rul. 74–396, 1974-2 C.B. 106 (tax benefit rule). The authorities have reasoned that since Sections 336 and

337 each apply to a liquidating corporation, the common-law tax doctrines should not be applicable to only one corporate liquidation provision without being applicable to the other.

**6.** The passage quoted from the Senate Report states as follows:

Section 337. *Gain or loss on sales or exchanges in connection with certain liquidations*

application of Section 337. The clear intent of Congress in enacting Section 337 was to remove the need to make a formalistic determination as to whether the corporation or its shareholders sold corporate property

> Section 337 corresponds in function to section 333 of the House bill and concerns the problems raised by the decisions in *Commissioner v. Court Holding Company*, 324 U.S. * * * [331, 65 S.Ct. 707, 89 L.Ed. 981] and *U. S. v. Cumberland Public Service Co.*, 338 U.S. * * * [451, 70 S.Ct. 280, 94 L.Ed. 251], and the numerous related cases. These decisions involve the question of whether the corporation or the shareholder effected a sale of property in connection with the liquidation of the corporation. Under the decision in *Cumberland Public Service Co., supra,* it is indicated that in the case of a distribution of property in liquidation of a corporation followed by its sale made in fact by its shareholders, a single tax is imposed at the shareholder level. Where the shareholders in fact did not effect the sale, tax is imposed both at the corporate and at the shareholder level. Accordingly, under present law the tax consequences arising from sales made in the course of liquidations may depend primarily upon the formal manner in which the transactions are arranged. Your committee intends in section 337 to provide a definitive rule which will eliminate the present uncertainties. S.Rep.No. 1622, 83d Cong., 2d Sess., p. 258 (3 U.S.C. Cong. & Admin. News 1954, pp. 4621, 4896).

Defendant quotes from the House Report as follows:

> (3) Court Holding Company.—Your committee's bill eliminates questions arising as a result of the necessity of determining whether a corporation in process of liquidating made a sale of assets or whether the shareholder receiving the assets made the sale. Compare *Commissioner v. Court Holding Company* (324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981), with *U. S. v. Cumberland Public Service Company* (332 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251). This last decision indicates that if the distributee actually makes the sale after receipt of the property then there will be no tax on the sale at the corporate level. In order to eliminate questions resulting only from formalities, your committee has provided that if a corporation in process of liquidation sells assets there will be no tax at the corporate level, but any gain realized will be taxed to the distributee-shareholder, as ordinary income or capital gain depending on the character of the asset sold. H.Rep.No. 1337, 83rd Cong., 2d Sess., pp. 38–39 (3 U.S.C. Cong. & Admin. News 1954, pp. 4017, 4063–4064).

during the course of a liquidation. Neither Section 337 nor its legislative history requires the immediate recognition of gain by the shareholders of the liquidating corporation in order for the section to apply.[7]

7. In 1973, the Internal Revenue Service issued a revenue ruling specifically for the purpose of discussing this point. It seems that in an earlier ruling, Rev.Rul. 56-387, the Service made the following statement:

> . . . Congress intended through Section 337 of the 1954 Code to eliminate the double tax on gains realized from sales of corporate assets during a period of liquidation but did not intend to eliminate entirely the tax on such gain. Where the shareholders are to receive nothing in the liquidation in payment for their stock, there is no possibility of a tax to both the corporation and the shareholders on the gains resulting from the sale. Rev. Rul. 56–387, 1956–2 C.B. 189.

On second thought the Internal Revenue Service came to the conclusion that this synopsis of the intent of Congress was erroneous so it published Rev.Rul. 73–264 specifically for the purpose of correcting this statement. In discussing the above-quoted passage, the Service stated as follows:

> The implication of these sentences is that Section 337 of the Code is not applicable to sales made by a corporation in the process of liquidation if there are liquidating distributions but such distributions do not result in a tax to the shareholders. *This rationale is erroneous.*

> In *Commissioner v. Court Holding Co.*, 324 U.S. 331 [, 65 S.Ct. 707, 89 L.Ed. 981] (1945), 1945 C.B. 58, the Supreme Court of the United States held that a sale of property by the shareholders of a corporation after receipt of the property as a liquidating distribution was taxable to the corporation when the corporation had in fact conducted all the negotiations and the terms of the sale had been agreed upon prior to the distribution of the property. However, in its decision in the *United States v. Cumberland Public Service Co.*, 338 U.S. 451 [, 70 S.Ct. 280, 94 L.Ed. 251] (1950) 1950–1 C.B. 18, the Court held that a sale of assets by the shareholders after distribution of the assets by the corporation pursuant to a liquidation was not taxable to the corporation. This later decision was based on the finding of fact by the trial court to the effect that the corporation had rejected an offer to sell the property and the negotiations had been carried on by the shareholders after receipt of the property in liquidation. Section 337 of the Code was enacted by Congress to provide a result that would obviate

For all the above reasons, this court holds that Section 337 prevents the recognition of the gain realized by Olivier on its sale of USI stock to unrelated third parties.

## V. RECOGNITION OF GAIN UPON THE LIQUIDATING DISTRIBUTION.

■ The second issue is whether any provision of the Internal Revenue Code of 1954 authorizes nonrecognition of the gain realized (except to the extent of cash received) by the taxpayers upon the distribution to them of all the assets of Olivier in exchange for all their stock in Olivier.

As to this issue, defendant argues that if Section 337 is applicable to the liquidation of Olivier, Section 331 "requires" that the taxpayers-shareholders recognize gain to the extent that the cash and fair market value of the assets distributed exceed their basis in the Olivier stock.

A quick review of the applicable statutory provisions reveals that defendant's argument must be rejected.

Section 331(a)(1) provides as follows:

(a) *General Rule.*

(1) *Complete liquidations.*—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock.

This provision says nothing about the *recognition* of gain upon the liquidation of a corporation. It simply states that the liquidating distribution shall be treated as payment in *exchange* for the stock. The legislative creation of an "exchange" has great bearing in the determination of the *character* of any gain or loss which is recognized since it fulfills one of the requirements for long term capital gain characterization (Section 1222(3)), however, the *recognition* of gain or loss is provided for elsewhere in the Code. Section 1001(c) provides that "in the case of a sale or exchange of property,

the extent to which the gain or loss determined under this section shall be recognized for purposes of this subtitle shall be determined under section 1002". Section 1002 states that "*Except as otherwise provided in this subtitle*, on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized". (emphasis added)

Section 354 of the Code is one of those provisions which provides otherwise. It provides that "*No gain or loss shall be recognized* if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization". Section 354(a)(1), Internal Revenue Code of 1954. Section 356 modifies this provision by providing that some or all of the gain may be "recognized" if certain unqualified property commonly referred to as "boot" is received in the exchange. Thus, where a corporation is liquidated as part of a plan of reorganization, these specific statutory provisions control the "recognition" of any gain or loss realized on the "exchange".

The initial illusion of avoidance created by these "non-recognition" provisions is dispelled by Section 358(a)(1) which provides that the basis of the USI stock received will, with minor adjustments, be the same as the basis of the Olivier stock given up. This provision thus preserves the gain and it will be recognized when the new stock is finally sold.

Defendant also asserts a variation of the argument made on the first issue that there is an "implicit" requirement that any gain realized by the taxpayers on the liquidation must be recognized immediately before Section 337 can apply. Defendant asserts that if Section 337 is deemed applicable, the

the necessity of determining whether a corporation in the process of complete liquidation made a sale of its assets or whether the shareholders made the sale after receipt of the assets. *See* S.Rep.No. 1622, 83rd Cong., 2d Sess. 48, 49 (1954). *Neither Section 337 of the Code nor its legislative history indicates that a liquidating distribution must re-*

*sult in a tax to the shareholders in order for Section 337 of the Code to apply.* For example, if the liquidating distribution to a shareholder is less than the basis of his stock, Section 337 of the Code applies even though the distribution does not result in a tax to the shareholder. Rev.Rul. 73–264, 1973–1 C.B. 178. (emphasis added)

legislative history implies that gain must be recognized immediately upon the liquidating distribution by the shareholders.

As stated hereinabove, no such requirement exists in either the statute or the legislative history.

To summarize, this court holds that Sections 354 and 356 are specifically applicable to the taxpayers and provide that no gain is recognized (except to the extent of cash received).

## VI. *TREATMENT OF THE CASH DISTRIBUTED IN THE LIQUIDATION.*

In its brief the defendant has discussed the proper characterization of any gain realized and recognized as a result of the distribution of cash from Olivier to the taxpayers. This issue is not before this court and therefore no determination shall be made as to the proper treatment.

Consistent with the foregoing, it is hereby, ORDERED that judgment in this case be for the plaintiffs, General Housewares Corporation and William D. and Virginia F. Sellers, and that they recover from the defendant the sums of $126,743.93 and $63,371.97 respectively, in taxes paid as transferees of Olivier Company, Inc. for income taxes allegedly due by Olivier Company, Inc. for the year ending August 30, 1969; together with interest paid on said sums of $26,086.69 and $13,043.34, respectively. Additionally, defendant is ordered to pay plaintiffs interest on such sums beginning with the date of their payment to the defendant, in the amount and manner provided by law.

## ORDER

Pursuant to Judge James H. Hancock's Memorandum of Decision dated November 1, 1977, in the case of *William D. Sellers, Jr. and Virginia F. Sellers, Plaintiffs, vs. United States of America, Defendant,* C.A. 75-H-782-S, which is incorporated herein by reference, the gain realized and recognized by Plantation Patterns, Inc., the predecessor of General Housewares Corporation, for the cash received in the distribution from Olivier was properly characterized as capital gain rather than ordinary income. This Order supplements my Opinion dated August 31, 1977, with regard to the above-styled case.